# EXHIBIT 8

**ELETSON HOLDINGS INC.**

**ACTION BY UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS**

Pursuant to the Business Corporation Act of 1977 of the Republic of Liberia and the Amended and Restated Bylaws (as defined below) of Eletson Holdings Inc., a Liberian corporation (the "***Company***"), the undersigned, constituting all of the members of the Company's board of directors (the "***Board***"), hereby adopt the following resolutions:

1. ***Amended and Restated Articles of Incorporation; Future Exchange of Class A***

**WHEREAS**, on October 25, 2024 and November 4, 2024, the United States Bankruptcy Court for the Southern District of New York entered an opinion and order (Docket Nos. 1212, 1223) confirming the Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors (Docket No. 1132) (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof, the "***Plan***") in the jointly administered chapter 11 cases for Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC, captioned, In re Eletson Holdings Inc., Case No. 23-10322 (JPM) (Bankr. S.D.N.Y.).

**WHEREAS**, the "**Effective Date**" (as defined in the Plan) of the Plan occurred on November 19, 2024.

**WHEREAS**, on the Effective Date, (i) pursuant to Section 3.3(i) of the Plan, all existing equity interests in the Company were "discharged, cancelled, released, and extinguished," (ii) pursuant to Section 5.8 of the Plan, the Company issued new equity interests in accordance with the Plan, and (iii) pursuant to Section 5.10(c) of the Plan, the members of the board of directors of the Company prior to the Effective Date have "no continuing obligations to the Company on or after the Effective Date and each such member will be deemed to have resigned or shall otherwise cease to be a director or manager of [the Company] on the Effective Date."

**WHEREAS**, the current Articles of Incorporation of the Company filed with the Republic of Liberia has authorized 10,000 Class A Shares.

**WHEREAS**, pursuant to the Plan, the Company adopted an Amended and Restated Articles of Incorporation on the Effective Date in form attached hereto as <u>Exhibit A</u> (the "***Restated Articles***").

**WHEREAS**, the Restated Articles provide for the authorization of 13,000,000 shares of common stock of the Company (the "***Common Stock***").

**WHEREAS**, the Board deems it in the best interest of the Company to plan to effectuate an exchange of outstanding Class A shares of the Company that have been issued pursuant to the Plan on the Effective Date (the "***Plan Shares***") for shares of Common Stock once the Company has filed the Restated Articles with the Republic of Liberia at a ratio of 1,300 shares of Common Stock for each share of Class A Share (the "***Exchange Ratio***").

**NOW, THEREFORE BE IT, RESOLVED**, that the Restated Articles are hereby ratified and affirmed.

**RESOLVED FURTHER**, that all prior acts made on behalf of the Company in connection with the adoption of the Restated Articles are hereby ratified and approved as acts of the Company.

**RESOLVED FURTHER**, that, in addition to the adoption of the Restated Articles under the Plan, each officer of the Company be, and each of them hereby is, authorized and directed to take all such action as such officer deems necessary or advisable to adopt the Restated Articles and file the Restated Articles with the Republic of Liberia with such changes as the Republic of Liberia may require, and to cause the Restated Articles to become registered.

**RESOLVED FURTHER**, that the Company shall plan to effectuate an exchange of Plan Shares for shares of Common Stock at the Exchange Ratio once the Company has filed the Restated Articles with the Republic of Liberia.

**2.** ***Adoption of Amended and Restated Bylaws***

**WHEREAS**, pursuant to the Plan, the Company adopted the Amended and Restated Bylaws dated as of the Effective Date in the form attached hereto as <u>Exhibit B</u> (the "***Restated Bylaws***") pursuant to the Plan.

**NOW, THEREFORE BE IT, RESOLVED**, that the adoption of the Restated Bylaws is hereby ratified and affirmed.

**RESOLVED FURTHER**, that all prior acts made on behalf of the Company in connection with the adoption of the Restated Bylaws are hereby ratified and approved as acts of the Company.

**3.** ***Shareholders Agreement***

**WHEREAS**, the Company became party to the Shareholders Agreement, dated as the Effective Date, by and between the Company and the shareholders of the Company identified therein in the form attached hereto as <u>Exhibit C</u> (the "***Shareholders Agreement***").

**NOW, THEREFORE BE IT, RESOLVED**, that the Shareholders Agreement and the Company's entry into the Shareholders Agreement are hereby ratified and affirmed.

**RESOLVED FURTHER**, that all prior acts made on behalf of the Company in connection with the filing of the Restated Articles are hereby ratified and approved as acts of the Company.

**4.** ***Number of Directors***

**WHEREAS**, Article III of the Restated Bylaws allows the number of the members of the Board to be fixed by the Board from time to time.

**WHEREAS**, the Board deems it advisable that the number of the members of the Board be fixed at three (3).

**NOW, THEREFORE, BE IT RESOLVED**, that number of the members of the Board shall be fixed at three (3).

**5.** ***Removal of Pre-Existing Officers and Election of New Officers***

**WHEREAS**, the terms of the Plan include the removal of the current officers of the Corporation.

**WHEREAS**, Article IV Section 4 of the Bylaws provides that any officer may be removed, with or without cause, by an affirmative vote of the majority of the Board.

**WHEREAS**, the Board has determined it advisable and in the best interest of the Company to remove and revoke all of the pre-existing officers of the Company as of the date hereof (the "***Pre-Existing Officers***").

**WHEREAS**, the Board has determined it advisable and in the best interest of the Company to revoke any and all authorizations and powers of the Pre-Existing Officers, including but not limited to revoking any and all Management Powers (as defined below) and any and all Bank Authorization Powers (as defined below) that the Company may have previously granted to the Pre-Existing Officers.

**WHEREAS**, Article IV Section 4 of the Bylaws provides that any vacancy in any office of the Company shall be filled by the Board.

**NOW, THEREFORE BE IT, RESOLVED**, that the Board hereby elects to remove and revoke the appointment of the Pre-Existing Officers of the Company, effective immediately.

**RESOLVED FURTHER**, that the Board hereby revokes any and all authorizations and powers of the Pre-Existing Officers, including but not limited to revoking any and all Management Powers (as defined below) and any and all Bank Authorization Powers (as defined below) that the Company may have previously granted to the Pre-Existing Officers.

**RESOLVED FURTHER**, that the following persons are appointed as officers of the Company, to the offices set forth opposite such person's name, to serve at the pleasure of the Board until their successor is duly elected and qualified, or until their earlier death, resignation or removal:

| | |
|---|---|
| President | Adam Spears |
| Secretary | Adam Spears |
| Chief Executive Officer | Adam Spears |

## 6. *Management Powers*

**NOW, THEREFORE BE IT, RESOLVED**, that the officers of the Company are authorized to sign and execute in the name and on behalf of the Company all applications, contracts, leases and other deeds and documents or instruments in writing of whatsoever nature that may be required in the ordinary course of business of the Company and that may be necessary to secure for operation of the corporate affairs, governmental permits and licenses for, and incidental to, the lawful operations of the business of the Company, and to do such acts and things as such officers deem necessary or advisable to fulfill such legal requirements as are applicable to the Company and its business (collectively, the "***Management Powers***").

## 7. *Authorized Designees*

**WHEREAS**, pursuant to Article IV, Section 3 of the Restated Bylaws, the Board may delegate powers or duties of the Company's officers to a third-party agent.

**WHEREAS**, given Mr. Mark Lichtenstein's knowledge of the Company, and with special consideration to the expediency required to manage the affairs of the Company on and after the Effective Date of the Plan, the Board has determined that it is in the best interests of the Company to delegate officer powers to Mr. Lichtenstein.

**NOW, THEREFORE BE IT, RESOLVED**, the Board hereby grants Mr. Lichtenstein all authorizations and powers of an officer of the Company, including but not limited to Management Powers and Bank Authorization Powers (as defined below), until such time as the Board determines to modify or revoke such authorizations and powers.

8. *Designation of Depositary*

**NOW, THEREFORE BE IT, RESOLVED**, that the Chief Executive Officer, President and Secretary of the Company are authorized to do the following (collectively, the "***Bank Authorization Powers***"):

(a) To designate one or more banks or similar financial institutions as depositories of the funds of the Company.

(b) To open, maintain and close general and special accounts with any such depositories, including any existing depository or similar accounts.

(c) To cause to be deposited, from time to time, in such accounts with any such depository, such funds of the Company as such officers deem necessary or advisable, and to designate or change the designation of the officer or officers or agent or agents of the Company authorized to make such deposits and to endorse checks, drafts and other instruments for deposit.

(d) To designate, change or revoke the designation, from time to time, of the officer or officers or agent or agents of the Company authorized to sign or countersign checks, drafts or other orders for the payment of money issued in the name of the Company against any funds deposited in any of such accounts, including any existing depository or similar accounts.

(e) To authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as banks and similar financial institutions customarily require as a condition for permitting the use of facsimile signatures.

(f) To make such general and special rules and regulations with respect to such accounts as they may deem necessary or advisable, and to complete, execute and certify any customary printed blank signature card forms in order to exercise conveniently the authority granted by this resolution, including any existing depository or similar accounts, and any resolutions printed on such cards are deemed adopted as a part of this resolution.

**RESOLVED FURTHER**, that all form resolutions required by any such depository are adopted in such form used by such depository, and the Secretary is (i) authorized to certify such resolutions as having been adopted by this Unanimous Written Consent and (ii) directed to insert a copy of any such form resolutions in the Company's minute book immediately following this Unanimous Written Consent.

**RESOLVED FURTHER**, that any such depository to which a certified copy of these resolutions has been delivered by the Secretary of the Company is authorized and entitled to rely upon such resolutions for all purposes until it has received written notice of the revocation or amendment of these resolutions adopted by the Board.

9. *Ratification and Discharge*

**NOW, THEREFORE BE IT, RESOLVED**, that all prior acts done on behalf of the Company by the officers appointed as of the date hereof or the officers' agents are ratified and approved as acts of the Company.

10. ***Omnibus Resolutions***

**NOW, THEREFORE BE IT, RESOLVED**: that each of the officers of the Company be and hereby are authorized and directed, for and on behalf of the Company, to execute and deliver all such instruments, documents and certificates and to take all such further action in connection with the resolutions above as they may deem necessary, advisable or proper to effectuate the intent and purposes of the foregoing resolutions.

**RESOLVED FURTHER**, that any and all actions heretofore taken by the Board, any authorized person and/or the agents of the Company, in furtherance or contemplation of any of these resolutions or as otherwise reflected in the minute books of the Company be, and each of such actions hereby is authorized, approved, confirmed and ratified in all respects as the act and deed of the Company by the Board; and

**RESOLVED FURTHER**: that these resolutions shall be filed in the minute books of the Company and shall be effective as of the date first written above.

**RESOLVED FURTHER**: that in the event any part of the above resolutions cannot be carried out or implemented for any reason, such part shall be deemed severable and shall not affect the enforceability or implementation of the remaining provisions of the above resolutions.

*[Signature Page Follows]*

Docusign Envelope ID: FD4972C3-6EA3-49A5-B7FF-AC1A5E3E192B

THIS ACTION BY UNANIMOUS WRITTEN CONSENT shall be effective on the date the Company receives the unanimous written consent of the Company's directors. This action by unanimous written consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other reliable reproduction of this action by unanimous written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board of Directors of the Company.

_Adam Spears_
_____        Date: 11-19-2024
Adam Spears


_____        Date: _____
Leonard J. Hoskinson


_____        Date: _____
Timothy B. Matthews


*[Signature Page to Eletson Holdings Inc. Board Consent]*

Docusign Envelope ID: E763D49C-0786-405B-89BD-08CB6D72ACAF

THIS ACTION BY UNANIMOUS WRITTEN CONSENT shall be effective on the date the Company receives the unanimous written consent of the Company's directors. This action by unanimous written consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other reliable reproduction of this action by unanimous written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board of Directors of the Company.

_____     Date: _____
Adam Spears


*Leonard J. Hoskinson*
_____     Date: 11-19-2024
Leonard J. Hoskinson


_____     Date: _____
Timothy B. Matthews


*[Signature Page to Eletson Holdings Inc. Board Consent]*

THIS ACTION BY UNANIMOUS WRITTEN CONSENT shall be effective on the date the Company receives the unanimous written consent of the Company's directors. This action by unanimous written consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other reliable reproduction of this action by unanimous written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used. This action by unanimous written consent shall be filed with the minutes of the proceedings of the Board of Directors of the Company.

_____     Date: _____
Adam Spears


_____     Date: _____
Leonard J. Hoskinson


*Timothy B. Matthews*
_____     Date: 11-19-2024
Timothy B. Matthews



*[Signature Page to Eletson Holdings Inc. Board Consent]*

## EXHIBIT A

Restated Articles

**ARTICLES OF AMENDMENT**
**AND RESTATED ARTICLES OF INCORPORATION**
**OF**
**ELETSON HOLDINGS INC.**

I, the undersigned, being the duly appointed, qualified and acting Authorized Signatory of Eletson Holdings Inc. (the "**Corporation**"), a Corporation organized under the Laws of the Republic of Liberia on the 4th day December, 1985, with registration number C-40191, hereby **CERTIFY THAT:**

1. The name of the corporation is Eletson Holdings Inc.

2. The Articles of Incorporation were filed with the Minister of Foreign Affairs as of the 4th day December, 1985.

3. Previous Amendments to the Articles of Incorporation were filed on February 15, 1994, June 29, 2007 and June 21, 2018.

4. Article II of the Articles of Incorporation presently reads as follows:

PURPOSE

The purpose of the Corporation is to engage in any lawful activity for which corporations may now or hereafter be organised under the Liberian Business Corporation Act.

      Is hereby amended to read as follows:

ARTICLE II

      The address of the registered office of the Corporation is 80 Broad Street, Monrovia, Liberia. The name of its registered agent shall be the LISCR Trust Company.

5. Article III of the Articles of Incorporation presently reads as follows:

ADDRESS

The registered address of the Corporation in Liberia shall be 80 Broad Street, Monrovia, Liberia. The name of the Corporation's registered agent at such address shall be The LISCR Trust Company.

      Is hereby amended to read as follows:

ARTICLE III

      The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Business Corporation Act.

6. Article IV of the Articles of Incorporation presently reads as follows:

Article IV CLASSES OF COMMON STOCK of the Restated Articles of Incorporation presently provides that the Corporation shall have two classes of common stock: Class A (the "Class A Shares") and Class C (the "Class C Shares"), the holders thereof being hereinafter called "Class A Holders" and "Class C Holders", respectively. The authorised number and description of the rights of such respective classes of common stock are as follows:

*Section 1: Aggregate Number of Shares.*

(a) The aggregate number of Class A Shares that the Corporation is authorised to issue is ten thousand (10,000) registered shares without par value,

(b) Upon filing of these Articles of Amendment with the Ministry of Foreign Affairs, the outstanding Class A and Class B Shares will be converted into new Class A Shares at a rate of conversion of one (1) (previous) Class A or Class B (as the case may be) Share to ten (10) (new) Class A Shares.

(c) The aggregate number of Class C Shares that the Corporation is authorised to issue is one hundred (100) registered shares without par value. Class C Shares shall be issued only to those persons deemed, in the sole discretion of the Board of Directors of the Corporation, to be senior management of the Corporation and/or any company wholly owned and controlled by such person, Any and all Class C Shares may be freely redeemed from time to time in the sole discretion of the Board of Directors upon payment by the Corporation to the holder of Class C shares of $100 per share and such other amounts, if any, as the Board of Directors has declared are payable at such time in accordance with the provisions of Section 2 (d) of this Article IV,

*Section 2: Dividend Rights*

(a) The Class A Holders shall be entitled to receive pro rata, when and as declared by the Board of Directors of the Corporation out of funds legally available for the purpose, annual cumulative dividends, as hereinafter provided (the **"Mandatory Dividend"),** payable in cash within 15 days from the date of the Annual General Meeting in each year, less the amount of any interim dividend previously paid by the Corporation in respect of the same fiscal year. The Mandatory Dividend shall be equal to the greater of (an): twenty five percent (25%) of Net Income for the year (as defined from time to time in the Corporation's accounting policies) adjusted to include only twenty percent (20%) of any Net Capital Gain (defined as the aggregate of capital gains less capital losses for any calendar year on ships, investments and other fixed assets) i.e. eighty percent (80%) of Net Capital Gain will be excluded from the calculation of adjusted Net Income, but all Net Capital Losses (if capital losses exceed capital gains) will he included; and **(bb)** Five Million United States Dollars (U.S.$5,000,000),

(b) To the extent permitted by law, the Shareholders of the Corporation, by written resolution, approved by the majority provided for in Article IV.4(a) hereof, may (aa) declare and require the Corporation from time to time to make interim dividend payments, in respect of a given fiscal year, and/or **(bb)** declare and require the Corporation to make dividend payments in amounts greater than the Mandatory Dividend.

(c) In the event that the Corporation does not pay a minimum annual aggregate dividend of at least Five Million United Stales Dollars (U.S.$5,000,000), the difference between **(a)** the aggregate amount of any dividends, if any, declared and actually paid in any calendar year and **(b)** Five Million United States Dollars (U,S,$5,000,000) shall accumulate, without interest, and be paid out, pro rata, to the Class A Holders on the earliest dole on which the Directors of the

Corporation determine that any such payment of accumulated dividends may lawfully and prudently be made; provided, however, that in the event that the full amount of such accumulated dividends is not paid within any two year period immediately after any portion of such accumulated amount first accrued, no further dividends shall thereafter accumulate on the Class A Shares until such time as all cumulative dividends which accrued during any such two year period have been paid in full.

(d) The Class C Holders shall be entitled to receive, when and ns declared by the Board of Directors of the Corporation out of funds legally available for the purpose, annual non- cumulative dividends as hereinafter provided in this paragraph (d), payable in cash on dales to be determined by the Board of Directors of the Corporation in the following amount: a percentage, to be determined by the Board of Directors of the Corporation, of the amount by which Net Income (as defined from time to time in the Corporation's accounting policies) for any calendar year (including all capital gains and losses) exceeds a specified level of return to be determined by the Board of Directors of the Corporation on the overage of the total stockholders' equity (as defined from time to time in the Corporation's accounting policies) of the Corporation at the beginning and end of such calendar year; *provided, however,* that no such dividend shall be paid in any year to the Class C Holders, if in any such year, the Class A Holders have not been paid in full all dividends payable to them in accordance with the provisions of Articles IV.2(a) and IV.2(c) of these Articles of Incorporation.

*Section 3: Liquidation Rights*

(a) Upon dissolution of the Corporation pursuant to Chapter 11 of the Liberian Business Corporation Act, the Class A Holders shall be entitled to receive a distribution of all remaining assets of the Corporation *pari passu.*

(b) Upon dissolution of the Corporation pursuant to Chapter 11 of the Liberian Business Corporation Act, the Class C Holders shall have no right to receive a distribution of any remaining assets of the Corporation.

*Section 4: Voting*

(a) Each Class A Holder shall be entitled to one vote per share on all matters with respect to which any Shareholder vote is solicited. Only the registered owners of Class A shares, or such owners' duly appointed proxies, shall have the right to participate in any meeting of Shareholders of the Corporation and to vote such *shares; provided, however,* that (aa) each Class A Holder may appoint only one proxy for all Class A Shares held by it, and (bb) such proxy must vote all shares represented by it in the same manner; and (cc) only the following shall be eligible to hold and vote any such proxy: (1) Original Shareholders (2) members of any of the Families (as such terms are defined in Article IV.4(c) hereof), and (3) any other person approved by the holders of not less than sixty five percent (65%) of Class A Shares, excluding those shares which are the subject of such proxy.

(b) Except as otherwise hereinafter provided all matters coming before any meeting of the Shareholders of the Corporation shall be decided by the vole of Shareholders entitled to cast sixty five percent (65%) of the total number of votes entitled to be cast at any such meeting; *provided, however;* that (aa) a unanimous (I 00%) vole of the Class A Holders entitled to vote shall be required to approve any and all amendments of the Articles of Incorporation and/or By-Laws of the Corporation, except as otherwise provided with respect to matters set forth in (bb) below, and **(bb)** as provided **in** ByLaws Article II (4) (bb) the investment in/or commencement of any new kind of business other than that currently contemplated by the Corporation and/or the dissolution and/or the sale of all or substantially all assets or shipping

assets (i.e. vessels or shares in shipowning corporations) of the Corporation, and/or the merger, consolidation or the like of the Corporation with another entity that is not a wholly owned subsidiary of the Corporation at the time of such merger, consolidation or the like shall be decided by the vote of Class A Holders entitled to cast eighty five percent (85%) of the total number of votes entitled to be cast at any such meeting, In the event that, upon the effectiveness of any proposed merger , consolidation or the like, the Corporation is not to be the surviving entity and the surviving entity is not to be an entity whose shares are publicly held, then upon the request of a dissenting Shareholder, the shareholders voting for approval of such merger, consolidation or the like, shall have the obligation, on or before the date of such proposed transaction, to acquire the shares of such dissenting Shareholder at a price equal to 110% of the price per share payable to approving Shareholders by the entity seeking to effect such merger, consolidation or the like with the Corporation. This obligation to acquire the shares from the dissenting Shareholders shall not be in derogation of any other rights under the Liberian Business Corporation Act of such dissenting Shareholders to seek judicial relief.

(c) For purposes of these Articles, the following terms shall have the meanings set forth below:

(1) <u>"Family"-ln</u> respect of the Corporation and each of the Current Shareholders, the Original Shareholder(s), their spouses and their *"lineal descendants"* as hereinafter defined.

(2) <u>"Original Shareholders"</u> - (a) In respect of the Corporation J. E. Karastamatis, E. B. Kertsikoff, A. B. Hadjieleftheriadis, Niki Zilakos and Vassiliki Andreoulakis, and (b) in respect of LASSIA INVESTMENT COMPANY J, E. Karastamatis and his spouse and linear descendants, (c) FAMILY UNITY TRUST COMPANY E. B. Kertsikoff and his spouse and linear descendants, (d) GLAFKOS TRUST COMPANY A. B. Hadjieleftheriadis and his spouse and linear descendants, (e) ELAFONISSOS SHIPPING CORPORATION Niki Zilakos and her spouse and lineal· descendants and (f) KEROS SHIPPJNG CORPORATION Vassiliki Andreoulakis and her spouse and linear descendants.

(3) The term *"Lineal Descendants"* of any Original Shareholder shall mean solely and exclusively any of (i) those children of an Original Shareholder who are (A) issue surviving from a marriage of such Original Shareholder, (B) legally recognized by such Original Shareholder, or (C) legally adopted by such Original Shareholder, and (ii) any of those children of a Lineal Descendent *as* defined in clause (i) of this sentence who me (A) issue surviving from a marriage of such Lineal Descendent, (B) legally recognized by such Lineal Descendent, .r by any controlling legal authority having jurisdiction or (C) legally adopted by such Lineal Descendent.

(4) <u>"Current Shareholders"</u> - The Liberian corporations LASSIA INVESTMENT COMPANY, GLAFKOS TRUST COMPANY, FAMILY UNITY TRUST COMPANY, ELAFONISSOS SHIPPING CORPORATION and KEROS SHIPPING CORPORATION, so long as each is a Class A Holder.

*Section 5: Reacquired Shares*

In the event the Corporation shall acquire any shares of stock of any class, whether under this Section or for any other reason, upon reacquisition of such shares, such shares shall be deemed Treasury shares and be no longer outstanding nor be taken into account for the computation of the quorum and the vote needed to approve a matter presented to the Shareholders herein provided, Said Article of the Restated Articles of Incorporation is hereby titled Article IV CLASSES OF COMMON STOCK AND PREFERRED STOCK and amended and restated to include at its end the following language:

Section 6: Preferred Shares

(i) There *is* hereby created a class of Preferred Stock designated as the "Preferred Shares," Any shares outstanding prior to the creation of the Preferred Shares are heretofore referred to *as* common shares and the holders thereof are referred to as common shareholders. For purposes of these Articles, "Preferred Shares" means the Preferred Shares of the Corporation representing Preferred Stock of the Corporation, having such rights associated with such Preferred Shares as set forth in these Articles and any equity securities issued or issuable in exchange for or with respect to such Preferred Shares (i) by way of a dividend, split or combination of shares or (ii) in connection with a reclassification, recapitalization, merger, consolidation or other reorganization.

(ii) The Preferred Shares shall consist of a single series and shall have a liquidation preference equal to USD 1,000.00 per unit of Preferred Share (the "Liquidation Preference").

(iii) No dividends shall accrue on the Preferred Shares. The Preferred Shares shall have no voting rights. The Preferred Shares shall be entitled to distributions to be made on the common shares at the times and in the aggregate amounts determined by the Board of Directors. Notwithstanding any provision to the contrary contained in these Articles, the Corporation shall not be required to make a distribution on the common stock if such distribution would violate the Liberian Business Corporation Act or any other applicable law or *that* certain indenture, *to* be dated on or about June 29, 2018, by and among the Corporation, Eletson Finance (US) LLC and Agathonissos Finance LLC, as co-issuers (together, the "Co-Issuers") and Wilmington Savings Fund Society, FSB, as trustee (the "Trustee") and collateral agent (the "Collateral Agent") (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Indenture") or any Security Document (as defined in the Indenture). For so long as no acceleration of the maturity elate of the Corporation's First Preferred Ship Mortgage Notes due 2022 issued pursuant to the Indenture (the "Notes") pursuant to Article VI of the Indenture due to the occurrence of an "Event of Default" under the Indenture (an "Acceleration") or Bankruptcy (as hereinafter defined) of the Corporation has occurred, no distributions shall be made on the Preferred Shares. Upon the occurrence of an Acceleration or a Bankruptcy of the Corporation, the holders of the Preferred Shares (the "Preferred Shareholders") shall be entitled to receive, with respect to their Preferred Shares, out of the assets of the Corporation legally available for distribution to its Shareholders before any payment shall be made to the holders of common shares, a distribution in respect of such Preferred Shares in an amount per Preferred Share equal to I00% of the Liquidation Preference. If, upon an Acceleration, the assets of the Corporation available for distribution to its Shareholders are insufficient to pay the Preferred Shareholders the full Liquidation Preference on each Preferred Share to which the Preferred Shareholders are entitled, the Preferred Shareholders shall share notably in any distribution of assets according to the respective amounts which would be payable with respect to such Preferred Shares held by them upon such distribution if all amounts payable on or with respect to such Preferred Shares were paid in **full.** Upon the payment of the full Liquidation Preference to which all Preferred Shares are entitled, 110 Preferred Shares shall be entitled to share in any further distribution of assets, all Preferred Shares shall then cease to be outstanding for any purpose hereunder and shall be cancelled automatically, without the need for any act of the Corporation or any Stockholder.

(iv) The total number of Preferred Shares which the Corporation shall have authority to issue shall be 300,000. On the date of the issuance of the Notes, the Corporation shall issue 300,000 Preferred Shares to Wilmington Savings Fund Society, in its capacity as the Preferred Shares Agent (the "Preferred Shares Agent").

(v) Each Preferred Share shall be identical to all other Preferred Shares in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a holder of

Preferred Shares as set forth in these Articles.

(vi) The Preferred Shares shall not be redeemable at the option of the Corporation or the Preferred Shareholders.

(vii)    At the time the principal amount of all of Notes issued pursuant to the Indenture has been satisfied and discharged in full, including, without limitation, (i) upon n payment in full of all outstanding Notes upon their maturity date, (ii) upon redemption of all outstanding Notes in accordance with the indenture, (iii) upon a payment in full of all outstanding Notes upon their acceleration or (iv) upon any other satisfaction of the Corporation's obligation to pay such principal amount, in each case other than pursuant to a Bankruptcy of the Corporation, the Corporation shall mandatorily 1 deem all of the outstanding Preferred Shares at a price per Preferred Share of $0.01. Upon the completion of such redemption, each Preferred Share so acquired in such mandatory redemption shall be cancelled and not reissued.

(viii)    So long as any Notes are outstanding, without the prior written consent of the Trustee (acting in accordance with the Indenture):

(A) The terms of the Preferred Shares may not be modified or amended;

(B) No additional Preferred Shares may be issued;

(C) No outstanding Preferred Shares may be redeemed or· cancelled, except as provided in these Articles;

(D) No amendments to these Articles that adversely affect the rights and privileges of the Preferred Shares or the Preferred Shareholders any be made;

(E) No additional shares in the Corporation that rank pari passu or senior as to liquidation preference or dividends to the Preferred Shares may be issued; and

(F) No common shares shall be issued other than to the common shareholders.

For purposes of this Article IV, "Bankruptcy" means, with respect to any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority (each a "Person"), (A) if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankruptcy or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer· seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or· of all or any substantial part of its properties, or (B) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or· any substantial part of *its* properties, the appointment is not vacated or stayed, or· within 90 days after the expiration of any such stay, the appointment is not vacated.

Is hereby amended to read as follows:

<u>ARTICLE IV</u>

The total number of shares of capital stock which the Corporation shall have the authority to issue is 13,000,000. The Corporation has one class of capital stock, referred to as Common Stock. There are 13,000,000 shares of authorized Common Stock, US$0.00001 par value per share ("Common Stock"). Except as otherwise provided herein or by applicable law, the holders of the Common Stock shall be entitled to one vote for each share of Common Stock held as of the applicable record date for each meeting of stockholders (and written actions in lieu of meetings). There shall be no cumulative voting.

7.  Article V of the Articles of Incorporation presently reads as follows:

"TRANSFER OF SHARES; MANDATORY REDEMPTION OF SHARES

Section 1: Transfer of Class A Shares.

No Class A Holder may transfer, and the Corporation shall not register the transfer of, any Class A Shares, whether by sale, assignment, pledge, gift, appointment or otherwise, except with the prior written approval of all Class A Holders and except: (a) to the Corporation, (b) to the Current Shareholders, as provided in Section 2 below, or (c) to a third party, as provided in section 3 below.

Section 2: Transfer of Class A Shares to the Current Shareholders.

(a)  Partial transfers of Class A Shares shall comprise not less than twenty percent (20%) of the Class A Holder's entire holding of Class A Shares.

(b)  The Class A Shares to be transferred by a Class A Holder shall be offered to all other Current Shareholders, on a pro rata basis to the respective holdings in Class A Shares of such other Current Shareholders, which offer shall include the offer price and any payment terms.

(c)  If any of the other Current Shareholders do not express an interest to acquire the Class A Shares offered to them within sixty (60) days of the date of such offer, then such shares shall be deemed offered under the same terms to the Current Shareholders who have expressed an interest to acquire the Class A Shares offered.

Section 3: Transfer of Class A Shares to a third party, not a Current Shareholder.

(a)  From the date hereof to and including June 30, 2011, no Class A Holder (a "Transferor") may transfer, and the Corporation shall not register the transfer of any Class A Shares, whether by sale, assignment, pledge, gift, appointment or otherwise, to a transferee not being a Current Shareholder, except as provided in Section 2 above and except with the prior written approval of all other Current Shareholders.

(b)  On or after July 1, 2011, a Transferor may transfer all (but not part) of the Class A Shares (the "Offered Shares") held by it at that time, to a transferee not

boing a Current Shareholder under the following conditions:

(i) All Offered Shares must be offered in writing by the Transferor to the Current Shareholders, other than the Transferor, together with a copy of the binding and unconditional commitment of a bona fide third party to buy the Offered Shares, at a stated price, in cash, on or before a date certain, and such commitment shall set forth all payment and other terms. Such offer by the Transferor (the "Offer to Current Shareholders") shall be on a pro rara basis to the respective holdings in Class A Shares of such other Current Shareholders.

(ii) The other Current Shareholders shall have the right to buy the Offered Shares, under the same terms as the third party, but with a ten percent (10%) discount on the price offered by the prospective third party transferee, and the Offer to Current Shareholders shall so provide. The unconditional commitment of any *bona fide* third party to buy the Offered Shares shall expressly acknowledge the rights of the Current Shareholders under this Section 3 (b)(ii).

(iii) If within sixty (60) days of the date of the Offer to Current Shareholders any of the other Current Shareholders do not express an interest to acquire the Offered Shares, such shares should be deemed offered under the same terms to the Current Shareholders who have expressed an interest to acquire the Offered Shares.

(iv) if some or all of the Offered Shores are not transferred to Current Shareholders and paid for within seventy five (75) days from the date of the Offer to the Current Shareholders, in accordance with the provisions of sub paragraph (b)(i) and (ii) above, the Transferor shall be entitled to transfer to the third party such of the Offered Shares for which no interest of acquisition has been expressed by the Current Shareholders or which the Current Shareholders have not purchased as herein provided; any such transfer to a third party shall be accomplished, and the purchase price for such Offered Shares paid, within ninety (90) days from the date of the Offer to the Current Shareholders and on the terms and conditions therein set forth.

Section 4: Transfer of Class C Shares.

No Class C Holder may transfer, and the Corporation shall not register the transfer of, any Class C Shares, whether by sale, assignment, pledge, gift, appointment or otherwise, except to the Corporation.

Section 5: Invalidity of Unauthorised Transfers.

Any purported transfer of shares of common stock not permitted hereunder shall be void and of no effect, and the purported transferee shall have no rights as a stockholder of the Corporation and no other rights against or with respect to the Corporation. The Corporation may, as a condition to the transfer of the registration of transfer of shares of common stock to a purposed transferee, require the furnishing of such affidavits or other proof, as it deems necessary to establish that such transferee is eligible to own such shares. The Corporation shall note on the certificates for shares of common stock the restrictions on transfer and registration

of transfer imposed by this Article V.

Section 6: Mandatory Redemption of Class A Shares.

Each Class A Holder and officer and director of the Corporation, as the case may be, shall give prompt written notice to the Corporation upon becoming aware of the occurrence of any Specified Event (as defined below), and the Secretory of the Corporation shall give written notice to each Class A Holder promptly upon receipt of any such notice of the occurrence *of* a Specified Event.

Upon the occurrence of any Specified Event (as defined below) respecting Class A Shares or a Class A Holder, all Class A Shares held by such affected Class A Holder shall be redeemed by the Corporation as of the first day of the next succeeding month after such Specified Event has occurred and at a price per share, calculated by the Corporation to be, equal to the book value of the Corporation's Common *Stock,* determined by adding the stated value of corporate assets as shown on the books of the Corporation and deducting from such sum ah the liabilities of the Corporation, and then dividing the resulting amount by the number of shares of the Corporation's Common Stock outstanding as of the most recently preceding fiscal year end.

For purposes of this Section 6, a **"Specified Event"** shall mean any of the following:

(a) The transfer or proposed transfer by a Class A Holder to any person or entity of any Class A Shares not in compliance with the terms and conditions of the Articles of Incorporation, as such may be amended from time to time.

(b) Any Class A Shares of a Class A Holder become subject to any lien or encumbrance voluntarily or involuntarily, and such lien or encumbrance is not removed within 30 days following notice to such Class A Holder of such lien or encumbrance given by a majority of the other Class A Holders requesting the removal of such lien or encumbrance.

(c) A Current Shareholder dissolves or otherwise ceases to exist and the purported transferee or successor in interest of any of the Class A Shares held by such Current Shareholder (i) is not another Current Shareholder, or (ii) is not approved in writing by all of the other remaining Class A Holders.

(d) A Current Shareholder is or becomes controlled, legally or beneficially, directly or indirectly, by a person other than Family. For purposes of the preceding sentence, the terms "controlled," "control," "controlled by" or the like shall mean any of the following: the power to elect a majority of the persons who manage the entity, the power to vote a majority of the equity interests of such entity, the power by agreement or otherwise to designate a majority of the board of directors (or similar managing body) of the entity, or otherwise to direct the policy and operations of the entity."

Is hereby amended to read as follows:

<u>Article V</u>

The Corporation shall not issue any non-voting capital stock.

8. Article VI of the Articles of Incorporation presently reads as follows:

VI. DIRECTORS The number of directors constituting the initial Board of Directors is three (3). As long as any Notes are outstanding, the Shareholders shall cause the Corporation at all times to have at least two Independent Directors (as hereinafter defined) who will be appointed by the Shareholders other than the Preferred Shareholders. The initial Independent Directors are Jim Lachance and Scott Vogel. To the fullest extent permitted by law, and notwithstanding any duly otherwise existing at law or in equity, the Independent Directors shall consider only the interests of the Corporation, including its creditors, in acting or otherwise voting on Material Actions (as hereinafter defined). Except for duties to the Corporation as set forth in the immediately preceding sentence (including duties to the Shareholders and the Corporation's creditors solely to the extent of their respective economic interests in the Corporation but excluding (i) all other interests of the common shareholders, (ii) the interests of other Affiliates of the Corporation, and (iii) the interests of any group of Affiliates of which the Corporation is a part), the Independent Directors shall not have any fiduciary duties to the Shareholders, any Director or any other Person bound by these Articles; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. To the fullest extent permitted by law, an Independent Director shall not be liable to the Corporation, the Shareholders or any other Person bound by these Articles for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct. No resignation or removal of an Independent Director, and no appointment of a successor Independent Director, shall be effective until such successor shall have accepted his or her appointment as an Independent Director by executing a counterpart to these Articles. In the event of a vacancy in the position of independent Directors, the remaining Independent Director (or if there is no remaining Independent Director, the common shareholders) shall, as soon as practicable, appoint a successor Independent Director. Notwithstanding anything to the contrary contained in these Articles, no Independent Director may be removed except for Cause, and no Independent Director shall be removed or replaced unless the Corporation provides the Trustee with no less than five (5) business days' prior written notice of(a) any proposed removal of such Independent Director, and (b) the identity of the proposed replacement Independent Director, together with a certification that such replacement satisfies the requirements for an Independent Director set forth in these Articles. All right, power and authority of the Independent Directors shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in these Articles, No Independent Director shall at any time serve as trustee in bankruptcy for any affiliate of the Corporation.

For purposes of this Article VI, "Cause" means, with respect to an Independent Director, (i) acts or omissions by such Independent Director constituting fraud, dishonesty, gross negligence, willful misconduct or other deliberate action which causes injury to the Corporation or an act by such Independent Director involving moral turpitude or a serious crime, or (ii) that such Independent Director no longer meets the definition of "Independent Director" as set forth in these Articles.

For purposes of this Article VI, "Material Action" means to (i) file or consent to the filing of any bankruptcy, insolvency or reorganization petition under any applicable federal or state law relating to bankruptcy naming the Corporation as debtor or otherwise institute bankruptcy or insolvency proceedings by or against the Corporation or otherwise seek with respect to such entity relief under any laws relating to the relief from debts or· the protection of debtors generally; (ii) seek or consent to the appointment of a receiver, liquidator, conservator, assignee, trustee, sequestrator, custodian or any similar official for the Corporation or all or any portion of any of its properties; (iii) make or consent to any assignment for the benefit of the Corporation's creditors; (iv) admit in writing the inability of the Corporation to pay its debts generally as they become due; (v) consent to substantive consolidation with any owner of the shares of the capital stock of the Corporation or any affiliate of such owner of capital stock; (vi) sell, exchange, lease or othe1wise

transfer all or substantially all of the assets of the Corporation or consolidate or merge the Corporation with or into another Person whether by means of a single transaction or a series of related transactions; (vii) amend these Articles (except as required by law) or the bylaws of the Corporation or (viii) to the fullest extent permitted by law, dissolve, liquidate or wind up the Corporation or approve of any proposal relating thereto.

For purposes of this Article VI, "Independent Director" shall mean an individual who bas prior experience as an independent director, independent manager or independent member with at least three years of employment experience and which individual is duly appointed as an Independent Director and is not, and has never been, and will not while serving as Independent Director be, any of the following: (i) a member, partner, equityholder, manager, director, officer or employee of the Corporation, the common shareholders, or any of their respective equityholders or affiliates (other than as an Independent Director or independent manager of the Corporation or an affiliate of the Corporation); (ii) a creditor, supplier or service provider (including provider of professional services) to the Corporation, or· any of its equityholders or affiliates (other than a nationally-recognized company that routinely provides professional independent managers or independent directors and other corporate services to the Corporation or any of its equityholders or affiliates in the ordinary course of its business); (iii) a family member of any such member, partner, equityholder, manager, director, officer, employee, creditor, supplier or service provider; or (iv) a Person that controls (whether directly, indirectly or otherwise) any of the Persons listed in clauses (i), (ii) or (iii) above. A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (i) by reason of being the independent manager or independent director of a "special purpose entity" affiliated with the Corporation shall be qualified to serve as an Independent Director of the Corporation, provided that the fees that such individual earns from serving as independent manager or independent director of affiliates of the Corporation in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

Notwithstanding any other provision of these Articles and any provision of law that otherwise so empowers the Corporation, so long as any Notes are outstanding, no Person shall be authorized or empowered on behalf of the Corporation to, nor shall they permit the Corporation to, and the Corporation shall not, without the prior unanimous written consent of the Board of Directors, including all Independent Directors, take any Material Action, provided, however, that, the Board of Directors may not authorize the taking of any Material Action unless there are at least two Independent Directors then serving in such capacity on the Board of Directors.

Until the date that is one year· and one day after the date on which the Indenture has been terminated in accordance with its terms and all Obligations (as defined in the Indenture) thereunder and under the other Security Documents (as defined in the Indenture) have been fully satisfied, the common shareholders shall not institute, or join any other Person in instituting, or authorize a trustee or other Person acting on its behalf or on behalf of others to institute, any involuntary bankruptcy, reorganization, arrangement, insolvency, liquidation or receivership proceedings against the Corporation, or, to the fullest extent permitted by law, make application for or institute or maintain any action for, the dissolution of the Corporation, in each case under the Liberian Business Corporation Act or any other applicable law.

Is hereby amended to read as follows:

<u>ARTICLE VI</u>

Subject to any additional vote required by this Articles of Incorporation or the Bylaws of the Corporation, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal,

alter, amend and rescind any or all of the Bylaws of the Corporation, subject to the provisions of that certain Shareholders Agreement, dated as of the date of this Articles of Incorporation, by and among the Corporation and the stockholders party thereto (as amended, modified, supplemented or restated from time to time, the "**Shareholders Agreement**").

9. Article VII of the Articles of Incorporation presently reads as follows:

POWERS

The Corporation shall have every power which a corporation now or hereafter organised under the Liberian Business Corporation Act may have.

Is hereby amended to read as follows:

ARTICLE VII

In the event of any conflicts or inconsistencies between the Bylaws of the Corporation and the Shareholders Agreement, the terms of the Shareholders Agreement shall control.

10. Article VIII of the Articles of Incorporation presently reads as follows:

Article VIII BY-LAWS The Board of Directors as well as the shareholders of the Corporation shall have the authority to adopt, amend or repeal the bylaws of the Corporation.

Notwithstanding any contrary provision of the Articles of Incorporation, the by- laws of the Corporation as from time to time adopted, or any provision of Law that otherwise so empowers the Corporation, the Board of Directors, any officer of the Corporation or any other Person, so long as any Notes are outstanding, neither the Board of Directors, nor any officer of the Corporation or any other Person shall be authorized or empowered on behalf of the Corporation to, nor shall they permit the Corporation to, and the Corporation shall not, without the prior unanimous written consent of the shareholders of the Corporation and the unanimous consent of the Independent Directors (as defined in Article VI), take, nor amend, modify or otherwise change the Articles of Incorporation or the by-laws of the Corporation. Any amendment, modification or other change to the Articles of Incorporation or the by-laws of the Corporation made in contravention of the foregoing shall, to the fullest extent permitted by law, be null and void *ab initio.*

Is hereby amended to read as follows:

ARTICLE VIII

Subject to any additional vote required by this Articles of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation and in the Shareholders Agreement. Each director shall be entitled to one vote on each matter presented to the Board of Directors.

11. Article IX of the Articles of Incorporation presently reads as follows:

### INDEMNIFICATION OF DIRECTORS, OFFICERS AND OTHER AUTHORISED REPRESENTATIVES

Section *1*: Indemnification of Directors and Officers in Third Party Proceedings.

The Corporation shall indemnify any director or officer of the Corporation who was or is on "authorised representative" of the Corporation (which shall mean for the purposes of this Article a director or officer of the Corporation, or a person serving at the request of the Corporation as a director, officer, partner or trustee of another corporation, limited liability company, partnership, joint venture, trust or other enterprise) and who was or is a "party" (which shall include for purposes of this Article the giving of testimony or similar involvement) or is threatened to be made a party to any "third party proceeding" (which shall mean for purposes of this Article any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, other than an action by or in the right of the Corporation) by reason of the fact that such person was or is an authorised representative of the Corporation, against expenses (which shall include for purposes of this Article attorneys' fees), judgements, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such third party proceeding if such person acted in good faith and in a manner such person reasonably believed to be in, or not opposed to, the best interests of the Corporation and, with respect to any criminal third party proceeding (which shall include for purposes of this Article any investigation which could or does lead to a criminal third party proceeding) had no reasonable cause to believe such conduct was unlawful. The termination of any third party proceeding by judgement, order, settlement, indictment, conviction or upon a plan of no contest or its equivalent, shall not, of itself: create a presumption that the authorised representative did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal third party proceeding, had reasonable cause to believe that such conduct was unlawful.

Section 2: Indemnification of Directors and Officers in Corporate Proceedings.

The Corporation shall indemnify any director or officer of the Corporation who was or is an authorised representative of the Corporation and who was or is a party or is threatened to be made a party to any "corporate proceeding" (which shall mean for purposes of this Article any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgement in its favour or any investigative proceeding by or on behalf of the Corporation) by reason of the fact that such person was or is an authorised representative of the Corporation, against expenses actually and reasonably incurred by such person in connection \Vith the defence or settlement of such corporate proceeding if such person acted in good faith and in a manner such person reasonably believed to be in, or not opposed to, the best interests of the Corporation, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of such person's duty to the Corporation unless and only to the extent that the court in which such corporate proceeding was pending shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such authorised representative is fairly and reasonably entitled to indemnify for such expenses which the court shall deem proper.

Section 3: Indemnification of Authorised Representatives.

To the extent that an authorised representative of the Corporation who neither was nor is a director or officer of the Corporation has been successful on the merits or otherwise in defence of any third party or corporate proceeding or in defence of any claim, issue or matter therein, such person shall be indemnified against expenses actually and reasonably incurred by such person in connection therewith. Such an authorised representative may, at the discretion of the Corporation, be indemnified by the Corporation in any other circumstances to any extent if the Corporation would be required by Sections 1 or 2 of this Article Ix to indemnify such person in such circumstances to such extent if such person were or had been a director or officer of the Corporation.

Section 4: Determination of Entitlement to Indemnification.

Any indemnification under Sections I, 2 or 3 of this Article IX (unless ordered by a court) shall be made by the Corporation only as authorised in the specific case upon a determination that indemnification of the authorised representative is proper in the circumstances because such person has either met the applicable standard of conduct set forth in Sections 1 or 2 of this Article IX or has been successful on the merits or otherwise as set forth in Section 3 of this Article IX and that the amount requested had been actually and reasonably incurred. Such determination shall be made:

(a)      by the Board of Directors by a majority of a quorum consisting of directors who were not parties to such third party or corporate proceeding, or

(b)      if such a disinterested quorum is not obtainable, by a majority of the entire board, including as voting members those directors who are or were parties to such third party or corporate proceeding, or

(c)      if such a disinterested quorum is not obtainable, or even if obtainable; a majority vote of such a quorum so directs, by independent legal counsel in a written opinion upon reference by the board of directors, or

(d)      by the Shareholders upon reference by the board of directors.

Section 5: Advance of Expenses.

Expenses actually and reasonably incurred in defending a third party or corporate proceeding shall be paid on behalf of a director or officer of the Corporation by the Corporation in advance of the final disposition of such third party or corporate proceeding as authorised in the manner provided in Section 4 of this Article IX upon receipt of an undertaking by or on behalf of the director or officer to repay such amount unless it shall ultimately be determined that such person is entitled to be indemnified by the Corporation as authorised in this Article and may be paid by the Corporation in advance on behalf of any other authorised representative when authorised by the board of directors or receipt of a similar undertaking. The financial ability of such authorised representative to make such repayment shall not be prerequisite to the making of an advance.

Section 6: Employee Benefit Plans.

For purposes of this Article IX the Corporation shall be deemed to have requested an authorised representative to serve an employee benefit plan where the performance by such person of duties to the Corporation also imposes duties on, or otherwise involves services by, such person to the plan or participants or beneficiaries of the plan; excise taxes assessed on an authorised representative with respect to an employee benefit plan pursuant to applicable law shall be deemed "fines"; and action taken or omitted by such person with respect to an employee benefit plan in the

performance of duties for a purpose reasonably believed to be in the interest of the participants and beneficiaries of the plan shall be deemed to be for a purpose which is not opposed to the best interest of the Corporation.

Section 7: Scope of Article.

The indemnification of authorised representatives, as authorised by this Article, shall:

(a)     not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any statute, agreement, vote of shareholders or disinterested directors or otherwise, both as to function in an official capacity and as to action in any other capacity,

(b)     continue as to a person who has ceased to be an authorised representative, and

(c)     inure to the benefit of the heirs, executors and administrators of such a person.

Section 8: Reliance on Provisions.

Each person who shall act as an authorised representative of the Corporation shall be deemed to be doing so in reliance upon the rights of indemnification provided by this Article IX.

Section 9: Insurance.

The Corporation may purchase and maintain insurance, on behalf of any person specified in Section 6.13 of the Liberian Business Corporation Act, against liability asserted against and incurred by any such person, whether or not the Corporation would have the power to indemnify any such person against such liability under the provisions of the aforesaid Section 6.13.

Is hereby amended to read as follows:

ARTICLE IX

Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.


12. Article X of the Articles of Incorporation presently reads as follows:
CORPORATE EXISTENCE

Corporate existence shall begin upon filing these Articles of Incorporation with the Minister of Foreign Affairs as of the filing date stated on these Articles.

Is hereby amended to read as follows:

ARTICLE X

Meetings of stockholders may be held within or outside of the Republic of Liberia, as the Shareholders Agreement or the Bylaws of the Corporation may provide. The books of the Corporation may be kept (subject to any provision of applicable law) outside of the Republic of Liberia at such place or places or in such

manner or manners as may be designated from time to time by the Board of Directors or in the Shareholders Agreement or the Bylaws of the Corporation.

13. There is currently no Article XI of the Articles of Incorporation.

The Articles of Incorporation are hereby amended to include the following Article XI to read as follows:

ARTICLE XI.

To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the Business Corporation Act or any other law of the Republic of Liberia is amended after approval by the stockholders of this Article Eleventh to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Business Corporation Act as so amended.

Any amendment, repeal or elimination of the foregoing provisions of this Article Eleventh by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such amendment, repeal or elimination.

14. There is currently no Article XII of the Articles of Incorporation.

The Articles of Incorporation are hereby amended to include the following Article XII to read as follows:

ARTICLE XII.

To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which the Business Corporation Act permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by the Business Corporation Act.

Any amendment, repeal, modification or elimination of the foregoing provisions of this Article Twelfth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal, modification or elimination; or (b) increase the liability of any director, officer or agent of the Corporation with respect to any acts

or omissions of such director, officer or agent occurring prior to such amendment, repeal, modification or elimination.

15. There is currently no Article XIII of the Articles of Incorporation.

The Articles of Incorporation are hereby amended to include the following Article XII to read as follows:

<u>ARTCILE XIII</u>

The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity. An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any stockholder (including a beneficial owner) of the Corporation or (ii) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries ("**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a stockholder or a director, respectively, of the Corporation. Any repeal or modification of this <u>Article 0</u> will only be prospective and will not affect the rights under this <u>Article 0</u> in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.

16. There is currently no Article XIV of the Articles of Incorporation.

The Articles of Incorporation are hereby amended to include the following Article XIV to read as follows:

<u>ARTICLE XIV</u>

Unless the Corporation consents in writing to the selection of an alternative forum, the courts of the State of Nevada (the "**Nevada Court**") shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Business Corporation Act or this Articles of Incorporation, the Shareholders Agreement or the Bylaws of the Corporation or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine or that otherwise relates to the internal affairs of the Corporation, except for, as to each of (i) through (iv) above, any claim as to which

the Nevada Court determines that there is an indispensable party not subject to the jurisdiction of the Nevada Court (and the indispensable party does not consent to the personal jurisdiction of the Nevada Court within 10 days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Nevada Court, or for which the Nevada Court does not have subject matter jurisdiction.

17. There is currently no Article XV of the Articles of Incorporation.

The Articles of Incorporation are hereby amended to include the following Article XV to read as follows:

ARTICLE XV

If any provision or provisions of this Articles of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Articles of Incorporation (including, without limitation, each portion of any sentence of this Articles of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

18. The Amendment to the Articles of Incorporation was authorized by vote of the holders of a majority of all outstanding shares entitled to vote thereon.

19. The Restated Articles of Incorporation as here included restate but do not change the provisions of the original Articles of Incorporation as amended and there is no discrepancy between the provisions of the Articles of Incorporation as previously amended, and the provisions of the Restated Articles of Incorporation.

The Articles of Incorporation, as previously amended are restated as follows:

**RESTATED**
**ARTICLES OF INCORPORATION**
**OF**
**ELETSON HOLDINGS INC.**

(Pursuant to the Business Corporation Act 1977, The Associations Law, Title 5, as Amended, of the Liberian Code of Laws Revised)

Eletson Holdings Inc., a corporation organized and existing under and by virtue of the provisions of the Business Corporation Act of 1977 of the Republic of Liberia (the "**Business Corporation Act**"),

**DOES HEREBY CERTIFY:**

**1.** That the name of this corporation is Eletson Holdings Inc., and that this corporation was originally incorporated pursuant to the Business Corporation Act on December 4, 1985.

**2.** Previous amendments to the Articles of Incorporation were filed with the Minister of Foreign Affairs as of February 15, 1994, June 29, 2007 and June 21, 2018.

**3.** That the Board of Directors of this corporation (the "**Board of Directors**") duly adopted resolutions proposing to amend and restate the Articles of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Articles of Incorporation of this corporation be amended and restated in its entirety to read as follows:

ARTICLE I

The name of this corporation is Eletson Holdings Inc. (the "**Corporation**").

ARTICLE II

The address of the registered office of the Corporation is 80 Broad Street, Monrovia, Liberia. The name of its registered agent shall be the LISCR Trust Company.

ARTICLE III

The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Business Corporation Act.

ARTICLE IV

The total number of shares of capital stock which the Corporation shall have the authority to issue is 13,000,000. The Corporation has one class of capital stock, referred to as Common Stock. There are 13,000,000 shares of authorized Common Stock, US$0.00001 par value per share ("**Common Stock**"). Except as otherwise provided herein or by applicable law, the holders of the Common Stock shall be entitled to one vote for each share of Common Stock held as of the applicable record date for each meeting of

1

stockholders (and written actions in lieu of meetings). There shall be no cumulative voting.

## ARTICLE V

The Corporation shall not issue any non-voting capital stock.

## ARTICLE VI

Subject to any additional vote required by this Articles of Incorporation or the Bylaws of the Corporation, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation, subject to the provisions of that certain Shareholders Agreement, dated as of the date of this Articles of Incorporation, by and among the Corporation and the stockholders party thereto (as amended, modified, supplemented or restated from time to time, the "**Shareholders Agreement**").

## ARTICLE VII

In the event of any conflicts or inconsistencies between the Bylaws of the Corporation and the Shareholders Agreement, the terms of the Shareholders Agreement shall control.

## ARTICLE VIII

Subject to any additional vote required by this Articles of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation and in the Shareholders Agreement. Each director shall be entitled to one vote on each matter presented to the Board of Directors.

## ARTICLE IX

Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

## ARTICLE X

Meetings of stockholders may be held within or outside of the Republic of Liberia, as the Shareholders Agreement or the Bylaws of the Corporation may provide. The books of the Corporation may be kept (subject to any provision of applicable law) outside of the Republic of Liberia at such place or places or in such manner or manners as may be designated from time to time by the Board of Directors or in the Shareholders Agreement or the Bylaws of the Corporation.

## ARTICLE XI

To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the Business Corporation Act or any other law of the Republic of Liberia is amended after approval by the stockholders of this Article XI to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Business Corporation Act as so amended.

Any amendment, repeal or elimination of the foregoing provisions of this Article XI by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the

Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such amendment, repeal or elimination.

ARTICLE XII

To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which the Business Corporation Act permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by the Business Corporation Act.

Any amendment, repeal, modification or elimination of the foregoing provisions of this Article XII shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal, modification or elimination; or (b) increase the liability of any director, officer or agent of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to such amendment, repeal, modification or elimination.

ARTICLE XIII

The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity. An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any stockholder (including a beneficial owner) of the Corporation or (ii) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries ("**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a stockholder or a director, respectively, of the Corporation. Any repeal or modification of this Article XIII will only be prospective and will not affect the rights under this Article XIII in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.

ARTICLE XIV

Unless the Corporation consents in writing to the selection of an alternative forum, the courts of the State of Nevada (the "**Nevada Court**") shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Business Corporation Act or this Articles of Incorporation, the Shareholders Agreement or the Bylaws of the Corporation or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine or that otherwise relates to the internal affairs of the Corporation, except for, as to each of (i) through (iv) above, any claim as to which the Nevada Court determines that there is an indispensable party not subject to the jurisdiction of the Nevada Court (and the indispensable party does not consent to the personal jurisdiction of the Nevada Court within 10 days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Nevada Court, or for which the Nevada Court does not have subject matter jurisdiction.

<u>ARTICLE XV</u>

If any provision or provisions of this Articles of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Articles of Incorporation (including, without limitation, each portion of any sentence of this Articles of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

\* \* \*

**4.** That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with the Business Corporation Act.

**5.** That this Articles of Incorporation, which restates and integrates and further amends the provisions of the Corporation's Articles of Incorporation, has been duly adopted in accordance with the Business Corporation Act.

[Signature Page Follows]

Docusign Envelope ID: F8AD2CB4-BBFF-4AC4-84C4-AD8E09E92B55

**IN WITNESS WHEREOF,** the undersigned has executed the Articles of Amendment and Restated Articles of Incorporation under penalty of perjury on this 19th day of November, 2024 and duly acknowledges that the facts stated therein are true and that the execution of the forgoing instrument is the act and deed of the corporation.

**Signature:** *Adam Spears*

**Name:**     Adam Spears
**Title:**     Authorized Signatory

**<u>EXHIBIT B</u>**

Restated Bylaws

**BYLAWS**


**ELETSON HOLDINGS INC.**
**(A LIBERIAN CORPORATION)**


**ADOPTED: November 19, 2024**

# BYLAWS
## OF
## ELETSON HOLDINGS INC.

## ARTICLE I

## OFFICES

1.     <u>Registered Office</u>. The registered office of the corporation in the Republic of Liberia shall be 80 Broad Street, Monrovia, Liberia or in such other location as the Board of Directors of the corporation (the "**Board**") may from time to time determine or the business of the corporation may require.

2.     <u>Other Offices</u>.  The corporation shall also have and maintain an office or principal place of business at such place as may be fixed by the Board, and may also have offices at such other places, both within and without the Republic of Liberia, as the Board may from time to time determine or the business of the corporation may require.

## ARTICLE II

## STOCKHOLDERS' MEETINGS

1.     <u>Place of Meetings</u>.  Meetings of the stockholders of the corporation shall be held at either a place, within or without the Republic of Liberia, or by means of remote communication, as the Board in its sole discretion may determine.

2.     <u>Annual Meetings</u>.  The annual meeting of the stockholders of the corporation, for the purpose of election of directors and for such other business as may lawfully come before it, shall be held on such date and at such time as may be designated from time to time by the Board and stated in the notice of the meeting.

3.      <u>Special Meetings</u>.  Special meetings of the stockholders of the corporation may be called, for any purpose or purposes, by request of (i) the Chairman of the Board, (ii) the Chief Executive Officer, (iii) the Board pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board for adoption) or (iv) by the holders of shares entitled to cast not less than fifty percent (50%) of the entire capital stock of the corporation issued and outstanding and entitled to vote at the meeting.  Such request shall state the purpose or purposes of the proposed meeting.  No business may be transacted at such special meeting other than as specified in such notice.  The Board shall determine the date, time and place of such special meeting, which shall be held not less than thirty-five (35) nor more than one hundred twenty (120) days after the date of the receipt of the request.  Upon determination of the time and place of the meeting, the officer receiving the request shall cause notice to be given to the stockholders entitled to vote at such meeting.  Nothing contained herein shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board may be held.

4.     Notice of Meetings.  Except as otherwise provided by law, notice, given in writing or by electronic transmission, of each meeting of stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting, such notice to specify the place, if any, date and hour, in the case of special meetings, the purpose or purposes of the meeting, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at any such meeting.  If mailed, notice is given when deposited in the mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the corporation.  Notice of the time, place, if any, and purpose of any meeting of stockholders may be waived in writing, signed by the person entitled to notice thereof or by electronic transmission by such person, either before or after such meeting, and will be waived by any stockholder by his attendance thereat in person, by remote communication, if applicable, or by proxy, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Any stockholder so waiving notice of such meeting shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

5.     Quorum.  Except where otherwise provided by law or by the Restated Articles of Incorporation of the corporation, as may be amended from time to time (the "**Articles of Incorporation**"), or by these bylaws, the presence, in person, by remote communication, if applicable, or by proxy duly authorized, of the holders of a majority of the outstanding shares of stock entitled to vote shall constitute a quorum for the transaction of business.  In the absence of a quorum, any meeting of stockholders may be adjourned, from time to time, either by the chairman of the meeting or by vote of the holders of a majority of the shares represented thereat, but no other business shall be transacted at such meeting.  The stockholders present at a duly called or convened meeting, at which a quorum is present, may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.  Except as otherwise provided by law, by the Articles of Incorporation, by that certain Shareholders Agreement, dated as of November 19, 2024, by and among the corporation and the stockholders party thereto (as amended, modified, supplemented or restated from time to time, the "**Shareholders Agreement**") or by these bylaws, in all matters other than the election of directors, the affirmative vote of a majority of shares present in person, by remote communication, if applicable, or represented by proxy duly authorized at the meeting and entitled to vote generally on the subject matter shall be the act of the stockholders.  Except as otherwise provided by law, the Articles of Incorporation, the Shareholders Agreement or these bylaws, directors shall be elected by a plurality of the votes of the shares present in person, by remote communication, if applicable, or represented by proxy duly authorized at the meeting and entitled to vote generally on the election of directors.  Where a separate vote by a class or classes or series is required, except where otherwise provided by the statute, by the Articles of Incorporation, by the Shareholders Agreement or by these bylaws, a majority of the outstanding shares of such class or classes or series, present in person, by remote communication, if applicable, or represented by proxy duly authorized, shall constitute a quorum entitled to take action with respect to that vote on that matter.  Except where otherwise provided by statute or by the Articles of Incorporation, the Shareholders Agreement or these bylaws, the affirmative vote of the majority (plurality, in the case of the election of directors) of shares of such class or classes or series present in person, by remote communication, if applicable, or represented by proxy at the meeting shall be the act of such class

or classes or series.

6. _Adjournment and Notice of Adjourned Meetings_.  Any meeting of stockholders, whether annual or special, may be adjourned from time to time either by the chairman of the meeting or by the vote of a majority of the shares present in person, by remote communication, if applicable, or represented by proxy.  When a meeting is adjourned to another time or place, if any, notice need not be given of the adjourned meeting if the time and place, if any, thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than thirty (30) days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

7. _Voting Rights_.  For the purpose of determining those stockholders entitled to vote at any meeting of the stockholders, except as otherwise provided by law, only persons in whose names shares stand on the stock records of the corporation on the record date as determined in accordance with Article VI Section 6 of these bylaws, shall be entitled to vote at any meeting of stockholders. Every person entitled to vote or execute consents shall have the right to do so either in person, by remote communication, if applicable, or by an agent or agents authorized by a proxy granted in accordance with Liberian law.  An agent so appointed need not be a stockholder.  No proxy shall be voted after three (3) years from its date of creation unless the proxy provides for a longer period.

8. _List of Stockholders_.  The Secretary shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at said meeting, arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, on a reasonably accessible electronic network, _provided_ that the information required to gain access to such list is provided with the notice of the meeting, or during ordinary business hours, at the principal place of business of the corporation.  The corporation shall take reasonable steps to ensure that such information is available only to stockholders of the corporation.  The list shall be open to examination of any stockholder (including by way of electronic access) during the time of the meeting as provided by law.

9. _Action Without a Meeting_.

(a)    Unless otherwise restricted by the Articles of Incorporation, any action required or permitted to be taken at any annual or special meeting of the stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing, or by electronic transmission setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted; _provided_, that the Company shall make reasonable efforts to provide a draft of such written consent to each stockholder of the corporation no later than 24 hours prior to the execution of such written consent; _provided_, further, that such advance notice will not be required if the Board (including the Minority Shareholder Director (as defined in the Shareholders Agreement)) or the holders of a

4

majority of the outstanding shares of stock reasonably determine that exigent circumstances require that such advanced notice is not practicable, in which case a copy of the written consent will be circulated reasonably promptly after it is executed, taking into consideration any such exigency circumstances.

(b)     No written consent or electronic transmission shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered to the corporation in the manner herein required, written consents or electronic transmissions signed by a sufficient number of stockholders to take action are delivered to the corporation by delivery to its registered office in the Republic of Liberia, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

(c)     Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be provided to the stockholders in accordance with Section 7.4.3, as may be amended from time to time, of the Business Corporation Act of 1977 (the "**Business Corporation Act**").

(d)     A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section, *provided* that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the corporation can determine (i) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder and (ii) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission.  The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed.  No consent given by telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the corporation by delivery to its registered office in the Republic of Liberia, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to a corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.  Notwithstanding the foregoing limitations on delivery, consents given by telegram, cablegram or other electronic transmission may be otherwise delivered to the principal place of business of the corporation or to an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the Board.  Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, *provided* that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

10.     <u>Organization</u>. At every meeting of stockholders, the Chairman of the Board, or, if a Chairman has not been appointed or is absent, the President, or, if the President is absent, a chairman of the meeting chosen by a majority in interest of the stockholders entitled to vote,

present in person or by proxy, shall act as chairman. The Secretary, or, in his absence, an Assistant Secretary directed to do so by the President, shall act as secretary of the meeting. The Board shall be entitled to make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary, appropriate or convenient. Subject to such rules and regulations of the Board, if any, the chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are necessary, appropriate or convenient for the proper conduct of the meeting. The date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting. Unless and to the extent determined by the Board, meetings of stockholders shall not be held in accordance with rules of parliamentary procedure.

## ARTICLE III

## DIRECTORS

1.      <u>Number and Term of Office</u>.  The authorized number of directors of the corporation shall be fixed by the Board from time to time in accordance with the terms of the Shareholders Agreement.  Directors need not be stockholders unless so required by the Articles of Incorporation.

2.      <u>Powers</u>.  The business of the corporation shall be managed by or under the direction of its Board, which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the Articles of Incorporation or by these bylaws directed or required to be exercised or done by the stockholders.  Notwithstanding the foregoing, the authority of the Board shall be subject in all respects to the terms and conditions of the Shareholders Agreement.

3.      <u>Term</u>.  Subject to the rights of the holders of any series of stock, if any, of the corporation to elect additional directors under specified circumstances, directors shall be elected at each annual meeting of stockholders to serve until the next annual meeting of stockholders.  Each director shall serve until his successor is duly elected and qualified or until his death, resignation or removal. No decrease in the number of directors constituting the Board shall shorten the term of any incumbent director.

4.      <u>Resignation</u>.  Any director may resign in accordance with the terms of the Shareholders Agreement.

5.      <u>Removal</u>.  Subject to any limitations imposed by applicable law, any or all directors may be removed in accordance with the terms of the Shareholders Agreement.

6.      <u>Vacancies</u>.  Unless otherwise provided in the Articles of Incorporation, any vacancies on the Board (whether due to resignation, removal or otherwise) and any newly created directorships resulting from any increase in the number of directors shall be filled in accordance with the terms of the Shareholders Agreement.

7.      <u>Meetings of the Board</u>.

        (a)      <u>Regular Meetings.</u>  Unless otherwise restricted by the Articles of Incorporation or

the Shareholders Agreement, regular meetings of the Board may be held at any time or date and at any place within or without the Republic of Liberia which has been designated by the Board and publicized among all directors, either orally or in writing, including by electronic means.  No further notice shall be required for a regular meeting of the Board.

(b)     Special Meetings.  Unless otherwise restricted by the Articles of Incorporation or the Shareholders Agreement, special meetings of the Board may be held at any time and place within or without the Republic of Liberia whenever called by the Chairman of the Board, the President or any director.  Notice of the time and place of all special meetings of the Board shall be given orally or in writing, by telephone, or by electronic means, during normal business hours, at least twenty-four (24) hours before the date and time of the meeting.  If such notice is sent by mail, it shall be sent by first class mail, postage prepaid at least three (3) days before the date of the meeting.  Notice of any special meeting may be waived in writing or by electronic transmission at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened

(c)     Meetings by Electronic Communications Equipment.  Any member of the Board, or of any committee thereof, may participate in a meeting by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)     Waiver of Notice.  Whenever any notice is required to be given under the provisions of the statutes or of the Articles of Incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

8.     Quorum and Voting.  A quorum of the Board shall be determined in accordance with the terms of the Shareholders Agreement.  At each meeting of the Board at which a quorum is present, all questions and business shall be determined by the affirmative vote of a majority of the directors present, unless a different vote be required by law, the Articles of Incorporation, the Shareholders Agreement or these bylaws; provided that in the event of a tie-vote where a quorum is present, the Chairman of the Board shall be permitted to cast a vote to decide such tie-vote.  The directors present at a duly organized meeting may continue to transact business until adjournment notwithstanding the withdrawal of enough directors to leave less than a quorum.

9.     Action Without a Meeting.  Unless otherwise restricted by the Articles of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and such writing or writings or transmission or transmissions are filed with the minutes of proceedings of the Board

or committee. A consent may be documented, signed and delivered in any manner permitted by the Business Corporation Act.

10.     Compensation.  Directors shall be entitled to such compensation for their services as may be approved by the Board, including, if so approved, by resolution of the Board, a fixed sum and expenses of attendance, if any, for attendance at each regular or special meeting of the Board and at any meeting of a committee of the Board.  Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise and receiving compensation therefor.

11.     Committees.  The Board may designate by resolution one or more committees, each committee to consist of one or more of the directors.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of this Article III, with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members; *provided*, however, that the time of regular and special meetings of committees may also be called by resolution of the Board.  The Board may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

12.     Organization.  At every meeting of the directors, the Chairman of the Board, or, if a Chairman has not been appointed or is absent, the President, or if the President is absent, the most senior Vice President (if a director) or, in the absence of any such person, a chairman of the meeting chosen by a majority of the directors present, shall preside over the meeting.  The Secretary, or in his absence, any Assistant Secretary directed to do so by the President, shall act as secretary of the meeting.

## ARTICLE IV

## OFFICERS

1.      Required and Permitted Officers.  The officers of the corporation shall be chosen by the Board and shall be a Chief Executive Officer, a President and a Secretary.  Unless otherwise provided in the Articles of Incorporation or any voting agreement amongst the stockholders, the corporation may also have, at the discretion of the Board, a Chairman of the Board, Vice-Chairman of the Board, Chief Financial Officer, a Treasurer, one or more Vice Presidents, Assistant Vice Presidents, Assistant Secretaries, and Assistant Treasurers, and any such other officers as may be appointed in accordance with the provisions of this Article IV.  Any number of offices may be held by the same person.

2.      Tenure and Duties of Officers.

        (a)     General.  Officers shall hold office at the pleasure of the Board and until their

successors shall have been duly elected and qualified, subject to Article IV Section 3. The Board may from time to time delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

(b)      <u>Duties of Chairman of the Board</u>.  The Chairman of the Board, if such an officer shall be elected and if present, shall preside at all meetings of the stockholders and the Board.  The Chairman of the Board shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board shall designate from time to time.

(c)      <u>Duties of the Chief Executive Officer</u>.  Subject to such supervisory powers, if any, as the Board may give to the Chairman of the Board, the Chief Executive Officer shall, subject to the control of the Board, have general supervision, direction, and control of the business and affairs of the corporation and shall report directly to the Board.  All other officers, officials, employees and agents shall report directly or indirectly to the Chief Executive Officer. The Chief Executive Officer shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board shall designate from time to time.

(d)      <u>Duties of President</u>.  The President shall preside at all meetings of the stockholders and at all meetings of the Board, unless the Chairman of the Board has been appointed and is present.  The President shall, subject to the control of the Board and any supervisory powers of the Chief Executive Officer, have general supervision, direction and control of the business and other officers of the corporation.  The President shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board shall designate from time to time.  The office of the President may, at any time and from time to time, be held by one or more persons.

(e)      <u>Duties of Vice Presidents</u>.  The Vice Presidents may assume and perform the duties of the President in the absence or disability of the President or whenever the office of President is vacant.  The Vice Presidents shall perform other duties commonly incident to their office and shall also perform such other duties and have such other powers as the Board or the President shall designate from time to time.

(f)      <u>Duties of Secretary</u>.  The Secretary shall attend all meetings of the stockholders and the Board and shall record all acts and proceedings thereof in the minute book of the corporation. The Secretary shall give notice in conformity with these bylaws of all meetings of the stockholders and of all meetings of the Board and any committee thereof requiring notice.  The Secretary shall perform all other duties provided for in these bylaws and other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board shall designate from time to time.  The President may direct any Assistant Secretary to assume and perform the duties of the Secretary in the absence or disability of the Secretary, and each Assistant Secretary shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board, the President or the Chief Executive Officer shall designate from time to time.

(g)      <u>Duties of Chief Financial Officer</u>.  The Chief Financial Officer shall keep or cause

to be kept the books of account of the corporation in a thorough and proper manner and shall render statements of the financial affairs of the corporation in such form and as often as required by the Board or the President. The Chief Financial Officer, subject to the order of the Board, shall have the custody of all funds and securities of the corporation. The Chief Financial Officer shall perform other duties commonly incident to his office and shall also perform such other duties and have such other powers as the Board or the President shall designate from time to time. The President may direct the Treasurer or any Assistant Treasurer, to assume and perform the duties of the Chief Financial Officer in the absence or disability of the Chief Financial Officer, and each Treasurer and Assistant Treasurer shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board or the President shall designate from time to time.

3. <u>Delegation of Authority.</u> The Board may from time to time delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

4. <u>Resignation; Removal; Vacancies</u>. Any officer may resign at any time by giving written notice to the Board or the President. Any such resignation shall be effective when received or at any later time specified therein. Unless otherwise specified therein, the acceptance of any such resignation shall not be necessary to make it effective. Any resignation shall be without prejudice to the rights, if any, of the corporation under any contract to which the resigning officer is a party. Any officer may be removed from office at any time, either with or without cause, by the affirmative vote of a majority of the directors in office at such time. Any vacancy occurring in any office of the corporation shall be filled by the Board.

## ARTICLE V

## EXECUTION OF CORPORATE INSTRUMENTS AND VOTING OF SECURITIES OWNED BY THE CORPORATION

1. <u>Execution of Corporate Instruments</u>. The Board, except as otherwise provided in these bylaws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the corporation. Such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount. All checks or demands for money and notes of the corporation shall be signed by such officer or officers or such other person or persons as the Board may from time to time designate.

2. <u>Voting of Securities Owned by the Corporation</u>. All stock and other securities of other corporations owned or held by the corporation for itself, or for other parties in any capacity, shall be voted, and all proxies with respect thereto shall be executed, by the person authorized so to do by resolution of the Board, or, in the absence of such authorization, by the Chairman of the Board, the Chief Executive Officer, the President, or any Vice President.

## ARTICLE VI

## SHARES OF STOCK

1. <u>Uncertificated Shares; Form and Execution of Certificates</u>. Notwithstanding any references to certificated shares in the Articles of Incorporation, the shares of the corporation shall be uncertificated, or, if resolved by the Board, represented by certificates. Certificates for the shares of stock, if any, shall be in such form as is consistent with the Articles of Incorporation and applicable law. Every holder of stock in the corporation represented by certificate shall be entitled to have a certificate signed by or in the name of the corporation by the Chairman of the Board, or the President or any Vice President and by the Treasurer or Assistant Treasurer or the Secretary or Assistant Secretary, certifying the number of shares owned by him in the corporation. Any or all of the signatures on the certificate may be facsimiles. In the event that any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, the certificate may be issued by the corporation with the same effect as if such officer, transfer agent or registrar were still acting as such at the date of issue. Certain shares of the corporation may be subject to forfeiture based on applicable equity incentive plans or other documentation related to the shares.

2. <u>Lost Certificates</u>. A new certificate or certificates shall be issued in place of any certificate or certificates, if any, theretofore issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. The corporation may require, as a condition precedent to the issuance of a new certificate or certificates, the owner of such lost, stolen, or destroyed certificate or certificates, or the owner's legal representative, to agree to indemnify the corporation in such manner as it shall require or to give the corporation a surety bond in such form and amount as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen, or destroyed.

3. <u>Transfers</u>. Transfers of record of shares of stock of the corporation shall be made only upon its books by the holders thereof, in person or by attorney duly authorized, and, in the case of stock represented by certificate, upon the surrender of a properly endorsed certificate or certificates for a like number of shares. The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the Business Corporation Act.

4. <u>Restrictions on Transfer</u>.

  (a) No holder of any of the shares of stock of the corporation (or of any Interest therein) may engage in any Prohibited Transaction, or enter into any agreement, arrangement, understanding or commitment with respect to any Prohibited Transaction, without the prior written consent of the corporation, upon duly authorized action of its Board. The corporation may withhold consent to a Prohibited Transaction for any legitimate corporate purpose, as determined by the Board. In the case of any Prohibited Transaction consented to by the corporation, the transferee, assignee, or other recipient shall receive and hold the stock or other applicable securities subject to the provisions of this Section, and there shall be no further Prohibited Transaction with respect to such stock or other applicable securities except in accordance with this Section.

(b)     A "**Prohibited Transaction**" means any of the following:

(i)     any sale, transfer, conveyance, assignment, pledge, hypothecation, loan, other disposal or encumbering of, or any contract to sell, any shares of stock of the corporation or any Interest therein, whether, directly or indirectly, voluntarily or by operation of law, by gift or otherwise (a "**Transfer**");

(ii)    any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of stock of the corporation;

(iii)   any transaction (or series of transactions) which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of any stock of the corporation, even if any stock of the corporation would be disposed of by someone other than the stockholder (including as a result of any change of control of such stockholder or any transfer or assignment of any shares of stock of such stockholder, or of any direct or indirect legal or beneficial right or interest in such stockholder);

(iv)    any transaction (or series of transactions) involving any short sale or any purchase, sale or grant of any right (including without limitation any put or call option) with respect to any security of the corporation or with respect to any security that includes, relates to, or derives any significant part of its value from any stock of the corporation, or any other action otherwise reducing risk related to ownership of such stock including without limitation through hedging, forward contracts or other derivative instruments; or

(v)     any grant of any proxy with respect to shares of the corporation other than (i) the granting of a proxy to (x) a person at the request of the Board, (y) officers or directors of the corporation (or any wholly owned limited liability companies of such directors or officers) or (z) any other person with specific direction to vote such shares as directed by the holder of such shares, without discretion, or (ii) pursuant to an agreement (including, without limitation, a voting agreement) to which the corporation is party and which has been approved by the Board.

(c)     "**Interest**" means any legal or beneficial right or interest in the stock of the corporation, including without limitation rights to vote (including depositing any shares of stock into a voting trust) or to receive or participate in dividends or other income with respect thereto.

(d)     Any repurchase of stock by the corporation (i) at the original purchase price per share or less (as adjusted for any stock combination, stock split, stock dividend, recapitalization or other similar transaction), upon the termination of employment or services, or (ii) at any price pursuant to the corporation's exercise of a right of first refusal to repurchase such shares shall be deemed to have been consented to for purposes of this Section.

(e)     If a stockholder desires to enter into a Prohibited Transaction, then the stockholder

will first give written notice to the corporation. The notice must name all other parties to the proposed Prohibited Transaction and state the number of shares or other securities or other rights or Interests that are proposed to be subject to the proposed Prohibited Transaction, the proposed consideration, and all other terms and conditions of the proposed Prohibited Transaction. Any shares proposed to be subject to a Transfer to which such Transfer the corporation has consented pursuant to paragraph (a) of this Section will first be subject to the corporation's right of first refusal located in Article VI Section 5.

(f)    At the option of the corporation, the stockholder will be obligated to pay to the corporation a reasonable fee related to the costs and time of the corporation and its legal and other advisors related to any proposed Prohibited Transaction.

(g)    Any Prohibited Transaction, or purported Prohibited Transaction, not made in strict compliance with this Section will be null and void, will not be recorded on the books of the corporation and will not be recognized by the corporation. Any transfers of record of shares of stock of the corporation will be made only upon its books by the holders thereof, in person or by attorney duly authorized, and, in the case of stock represented by certificate, upon the surrender of a properly endorsed certificate or certificates for a like number of shares.

(h)    The restriction on Prohibited Transactions set forth in  Article VI Section 4(a) will terminate upon the date securities of the corporation are first offered to the public pursuant to a registration statement filed with, and declared effective by a public exchange.

(i)    The certificates, if any, representing shares of stock of the corporation will bear on their face the following legend so long as the foregoing Transfer restrictions are in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRANSFER RESTRICTION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION.".

(j)    <u>Termination of Restriction on Transfer</u>. The restriction on transfer set forth in this Section and the right of first refusal set forth in Article VI Section 5 shall lapse upon the earlier of (i) immediately prior to the consummation of a Liquidation Event, which means (unless such term is defined in the Articles of Incorporation) (a) a transaction or series of related transactions in which any "person" or "group", becomes the beneficial owner, directly or indirectly, of more than 50% of the outstanding voting securities of the corporation having the right to vote for the election of members of the corporation's board of directors, (b) any reorganization, merger or consolidation of the corporation, other than a transaction or series of related transactions in which the holders of the voting securities of the corporation outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the corporation or such other surviving or resulting entity, (c) a sale, lease or other disposition of all or substantially all of the assets of the corporation and (d) the corporation's initial listing of its common stock on a national securities exchange by means of an effective registration statement filed by the corporation that registers shares of existing capital stock of the corporation for resale, as approved by the corporation's board of directors (for the avoidance of doubt, such listing shall

not be deemed to be an underwritten offering and shall not involve any underwriting services) and (ii) immediately prior to the corporation's first firm commitment underwritten public offering of its securities pursuant to a registration statement.

(k)     Conflicts.   To the extent this Section conflicts with any written agreements (including the Shareholders Agreement) between the corporation and the stockholder attempting to Transfer shares, such agreement shall control.

5.     Right of First Refusal. No stockholder will Transfer any of the shares of stock of the corporation, except by a Transfer that meets the requirements set forth in this Section, in addition to any other restrictions or requirements set forth under applicable law or these bylaws:

(a)     If the stockholder desires to Transfer any of the stockholder's shares of stock, then the stockholder must first give written notice thereof to the corporation.  The notice must name the proposed transferee and state the number of shares to be transferred, the proposed consideration, and all other terms and conditions of the proposed transfer.

(b)     For thirty (30) days following receipt of such notice, the corporation has the option to purchase up to all the shares specified in the notice at the price and upon the terms set forth in such notice.  In the event of a gift, property settlement or other Transfer in which the proposed transferee is not paying the full price for the shares, and that is not otherwise exempted from the provisions of this Section, the price will be deemed to be the fair market value of the stock at such time as determined in good faith by the Board.  In the event the corporation elects to purchase all of the shares or a lesser portion of the shares, it will give written notice to the transferring stockholder of its election and settlement for said shares will be made as provided below in paragraph (d) of this Section.

(c)     The corporation may assign its rights hereunder.

(d)     In the event the corporation and/or its assignee(s) elect to acquire any of the shares of the transferring stockholder as specified in said transferring stockholder's notice, the Secretary of the corporation will so notify the transferring stockholder and settlement thereof will be made in cash in an amount in accordance with the terms set forth in said transferring stockholder's notice delivered to the corporation pursuant to Article VI Section 5(a), but in all instances subject to Article VI Section 5(b), within thirty (30) days after the Secretary of the corporation receives said transferring stockholder's notice; *provided* that if the terms of payment set forth in said transferring stockholder's notice were other than cash against delivery, the corporation and/or its assignee(s) will pay for said shares on the same terms and conditions set forth in said transferring stockholder's notice.

(e)     In the event the corporation and/or its assignee(s) do not elect to acquire all of the shares specified in the transferring stockholder's notice, said transferring stockholder may, subject to the corporation's approval and all other restrictions on Transfer located in Article VI Section 4, within the sixty (60) days period following the expiration or waiver of the option rights granted to the corporation and/or its assignee(s) herein, Transfer the shares specified in said transferring stockholder's notice that were not acquired by the corporation and/or its assignee(s) as specified

in said transferring stockholder's notice.  All shares so sold by said transferring stockholder will continue to be subject to the provisions of this Section in the same manner as before said Transfer.

(f)     Anything to the contrary contained herein notwithstanding, the following transactions are exempt from the right of first refusal contained in this Section:

(i)     A stockholder's Transfer of any or all shares held either during such stockholder's lifetime or on death by will or intestacy to such stockholder's immediate family or to any custodian or trustee for the account of such stockholder or such stockholder's immediate family or to any limited partnership or limited liability company of which the stockholder, members of such stockholder's immediate family or any trust for the account of such stockholder or such stockholder's immediate family will be the general or limited partner(s) of such partnership or the controlling member(s) of such limited liability company. "Immediate family" as used herein means spouse, life partner or similar statutorily-recognized domestic partner, lineal descendant, father, mother, brother, or sister of the stockholder making such Transfer;

(ii)    A stockholder's Transfer of any or all of such stockholder's shares to the corporation or to any other stockholder of the corporation;

(iii)   A stockholder's Transfer of any or all of such stockholder's shares to a person who, at the time of such Transfer, is an officer or director of the corporation;

(iv)    A corporate stockholder's Transfer of any or all of its shares pursuant to and in accordance with the terms of any merger, consolidation, reclassification of shares or capital reorganization of the corporate stockholder, or pursuant to a sale of all or substantially all of the stock or assets of a corporate stockholder;

(v)     A corporate stockholder's Transfer of any or all of its shares to any or all of its stockholders;

(vi)    A Transfer pursuant to Section 4.03 (Drag-along Rights) and Section 4.07 (Tag-along Rights) of the Shareholders Agreement; or

(vii)   A Transfer by a stockholder that is a limited or general partnership to any or all of its partners or former partners in accordance with partnership interests.

In any such case, the transferee, assignee or other recipient will receive and hold such stock subject to the provisions of this Section and any other restrictions set forth in these bylaws, and there will be no further Transfer of such stock except in accord with this Section and the other provisions of these bylaws.

(g)     The provisions of this Section may be waived with respect to any Transfer either by the corporation, upon duly authorized action of its Board, or by the stockholders, upon the express written consent of the owners of a majority of the voting power of the corporation (excluding the votes represented by those shares to be transferred by the transferring stockholder).

This Section may be amended or repealed either by a duly authorized action of the Board or by the stockholders, upon the express written consent of the owners of a majority of the voting power of the corporation.

(h)     Any Transfer, or purported Transfer, of securities of the corporation in violation of this Article VI Section 4 shall be null and void.

(i)     The foregoing right of first refusal will terminate upon the date securities of the corporation are first offered to the public pursuant to a registration statement.

(j)     In addition to the requirements set forth in Article VI Section 4(i), the certificates, if any, representing shares of common stock of the corporation that are subject to the right of first refusal contained in this Section will bear on their face the following legend so long as the foregoing right of first refusal remains in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEE(S), AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

(k)     To the extent this Section conflicts with any written agreements (including the Shareholders Agreement) between the corporation and the stockholder attempting to Transfer shares, such agreement will control.

6.     Fixing Record Dates.  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board may fix a record date which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided*, however, that the Board may fix a new record date for the adjourned meeting.

7.     Registered Stockholders.  The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the Republic of Liberia.

## ARTICLE VII

## DIVIDENDS

1.     Dividends.  Dividends upon the capital stock of the corporation, if any, subject to the provisions of the Articles of Incorporation, may be declared by the Board at any regular or special meeting, pursuant to law.  Dividends may be paid in cash, in property or in shares of the capital

stock, subject to the provisions of the Articles of Incorporation.

2.      <u>Dividend Reserve</u>.  Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the Board from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose as the Board shall think conducive to the interests of the corporation, and the Board may modify or abolish any such reserve in the manner in which it was created.

## ARTICLE VIII

## GENERAL MATTERS

1.      <u>Fiscal Year</u>.  The fiscal year of the corporation shall be fixed by resolution of the Board.

2.      <u>Records</u>.  Any records maintained by the corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be kept on or by means of, or be in the form of, any information storage device or method, *provided* that the records so kept can be converted into clearly legible paper form within a reasonable time.

## ARTICLE IX

## INDEMNIFICATION

1.      <u>Directors and Officers</u>.  The corporation shall indemnify its directors and officers to the fullest extent not prohibited by the Business Corporation Act or any other applicable law; *provided*, however, that the corporation may modify the extent of such indemnification by individual contracts with its directors and officers; and, *provided*, further, that the corporation shall not be required to indemnify any director or officer in connection with any proceeding (or part thereof) initiated by such person pursuant to these bylaws unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the Board, (iii) such indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the Business Corporation Act or any other applicable law or (iv) such indemnification is required to be made pursuant to this Article IX Section 1.

2.      <u>Employees and Other Agents</u>.  The corporation shall have power to indemnify its officers, employees and other agents as set forth in the Business Corporation Act or any other applicable law.  The Board shall have the power to delegate the determination of whether indemnification shall be given to any such person to such officers or other persons as the Board shall determine.

3.      <u>Expenses</u>.  The corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, prior to the final disposition of the proceeding, promptly following request therefor, all expenses incurred by any director or officer in connection with such proceeding, *provided*, however, that, if

the Business Corporation Act requires, an advancement of expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Article IX or otherwise. Notwithstanding the foregoing, unless otherwise determined pursuant to Section 4 of this Article IX, no advance shall be made by the corporation to an officer of the corporation (except by reason of the fact that such officer is or was a director of the corporation, in which event this sentence shall not apply) in any action, suit or proceeding, whether civil, criminal, administrative or investigative, if a determination is reasonably and promptly made (i) by a majority vote of directors who were not parties to the proceeding, even if not a quorum, or (ii) by a committee of such directors designated by a majority of such directors, even though less than a quorum, or (iii) if there are no such directors, or such directors so direct, by independent legal counsel in a written opinion, that the facts known to the decision-making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the interests of the corporation.

4.      The Company hereby acknowledges that any person who may be entitled to indemnification under this Article IX may have certain rights to indemnification, advancement of expenses and/or insurance provided by any stockholder or its respective affiliates (excluding the corporation and its subsidiaries). The corporation hereby agrees, on behalf of itself and its subsidiaries, (i) that it is an indemnitor of first resort (i.e., its obligations to any person who may be entitled to indemnification under this Article IX are primary and any obligation of any stockholder or its respective affiliates to advance expenses or to provide indemnification for the same expenses or liabilities incurred by or on behalf of such person is secondary), (ii) that it shall be required to advance the full amount of expenses incurred by or on behalf of any person who may be entitled to indemnification under this Article IX and shall be liable for the full amount of all losses to the extent legally permitted and as required by the terms of the Articles of Incorporation, the Shareholders Agreement and these bylaws (or, to the extent applicable, Business Corporation Act of 1977 of the Republic of Liberia), without regard to any rights such person may have against any stockholder or its respective affiliates (including under director and officer insurance policies), and (iii) that it irrevocably waives, relinquishes and releases each stockholder and its respective affiliates from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof. The corporation further agrees that no advancement or payment by any stockholder or its respective affiliates on behalf of any person who may be entitled to indemnification under this Article IX with respect to any claim for which such person has sought indemnification from the corporation or its subsidiaries shall affect the foregoing, and such stockholder and its respective affiliates shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such person against the corporation or its subsidiaries.

5.      Advancement of Expenses; Enforcement. Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and officers under this bylaw shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a

contract between the corporation and the director or officer. Any right to indemnification or advances granted by this Article IX to a director or officer shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefor. The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting the claim. In connection with any claim for indemnification, the corporation shall be entitled to raise as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under the Business Corporation Act or any other applicable law for the corporation to indemnify the claimant for the amount claimed. In connection with any claim by an officer of the corporation (except in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such officer is or was a director of the corporation) for advances, the corporation shall be entitled to raise as a defense as to any such action clear and convincing evidence that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the interests of the corporation, or with respect to any criminal action or proceeding that such person acted without reasonable cause to believe that his conduct was lawful. Neither the failure of the corporation (including its Board, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the Business Corporation Act or any other applicable law, nor an actual determination by the corporation (including its Board, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct. In any suit brought by a director or officer to enforce a right to indemnification or to an advancement of expenses hereunder, the burden of proving that the director or officer is not entitled to be indemnified, or to such advancement of expenses, under this Article IX or otherwise shall be on the corporation.

6.      Non-Exclusivity of Rights.  The rights conferred on any person by this Article IX shall not be exclusive of any other right which such person may have or hereafter acquire under any applicable statute, provision of the Articles of Incorporation, the Shareholder Agreement, bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding office.  The corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by the Business Corporation Act or any other applicable law.

7.      Survival of Rights.  The rights conferred on any person by this Article IX shall continue as to a person who has ceased to be a director, or officer, employee or other agent and shall inure to the benefit of his or her heirs, executors and administrators.

8.      Insurance.  To the fullest extent permitted by the Shareholder Agreement, the Business Corporation Act, or any other applicable law, the corporation, upon approval by the Board, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this Article IX.

9.    Amendments.  Any repeal or modification of this Article IX shall only be prospective and shall not affect the rights under this bylaw in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the corporation.

10.    Savings Clause.  If this bylaw or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the corporation shall nevertheless indemnify each director and officer to the full extent not prohibited by any applicable portion of this bylaw that shall not have been invalidated, or by any other applicable law.  If this Article IX shall be invalid due to the application of the indemnification provisions of another jurisdiction, then the corporation shall indemnify each director and officer to the full extent under applicable law.

11.    For the purposes of this Article IX, the following definitions shall apply:

(a)    The term the "**corporation**" shall include, in addition to the resulting corporation, any constituent corporation (and any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall be in the same position under the provisions of this Article IX with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

(b)    References to a "**director**," "**executive officer**," "**officer**," "**employee**," or "**agent**" of the corporation shall include, without limitation, situations where such person is serving at the request of the corporation as, respectively, a director, executive officer, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

(c)    The term "**expenses**" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

(d)    References to "**other enterprises**" shall include employee benefit plans; references to "**fines**" shall include any excise taxes assessed on a person with respect to an employee benefit plan; references to "**serving at the request of the corporation**" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall have acted in a manner "**not opposed to the interests of the corporation**."

(e)    The term "**proceeding**" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

**ARTICLE X**

## OTHER SECURITIES OF THE CORPORATION

1. <u>Execution of Other Securities</u>.  All bonds, debentures and other corporate securities of the corporation, other than stock certificates (covered in Article VI Section 1 of these bylaws), may be signed by the Chairman of the Board, the Chief Executive Officer, the President or any Vice President, or such other person as may be authorized by the Board. Interest coupons appertaining to any such bond, debenture or other corporate security, will be signed by the Treasurer or an Assistant Treasurer of the corporation or such other person as may be authorized by the Board, or bear imprinted thereon the facsimile signature of such person.  In case any officer who has signed or attested any bond, debenture or other corporate security, or whose facsimile signature appears thereon or on any such interest coupon, has ceased to be such officer before the bond, debenture or other corporate security so signed or attested has been delivered, such bond, debenture or other corporate security nevertheless may be adopted by the corporation and issued and delivered as though the person who signed the same or whose facsimile signature has been used thereon had not ceased to be such officer of the corporation.

## ARTICLE XI

## NOTICES

1. <u>Notice to Stockholders</u>.  Written notice to stockholders of stockholder meetings shall be given as provided in Article II Section 4.  Without limiting the manner by which notice may otherwise be given effectively to stockholders under any agreement or contract with such stockholder, and except as otherwise required by law, written notice to stockholders for purposes other than stockholder meetings may be sent by mail or nationally recognized overnight courier, or by facsimile, telegraph or telex or by electronic mail or other electronic means.

2. <u>Notice to Directors</u>.  Any notice required to be given to any director may be given by the method stated in Article XI Section 1, or as provided for in Article III Section 7.  If such notice is not delivered personally, it shall be sent to such address as such director shall have filed in writing with the Secretary, or, in the absence of such filing, to the last known post office address of such director.

3. <u>Affidavit of Mailing</u>.  An affidavit of mailing, executed by a duly authorized and competent officer of the corporation or an agent of the corporation, specifying that notice has been given in writing or by a form of electronic transmission, shall, in the absence of fraud, be prima facie evidence of the facts therein contained.

4. <u>Notice to Person with whom Communication is Unlawful</u>.  Whenever notice is required to be given, under any provision of law or of the Articles of Incorporation or bylaws of the corporation, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person.

## ARTICLE XII

## LOANS TO OFFICERS

1.  <u>Loans to Officers</u>. Except as otherwise prohibited under applicable law, the corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiaries, including any officer or employee who is a director of the corporation or its subsidiaries, whenever, in the judgment of the Board, such loan, guarantee or assistance may reasonably be expected to benefit the corporation. The loan, guarantee or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board approves, including, without limitation, a pledge of shares of stock of the corporation. Nothing in these bylaws is deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

## ARTICLE XIII

## RETAINED CAUSES OF ACTION

1.  <u>Retained Causes of Action</u>. Any decisions that the corporation makes related to any Levona Claims (as defined in the Shareholders Agreement) shall be made in accordance with the terms of the Shareholders Agreement.

## ARTICLE XIV

## MISCELLANEOUS

1.  <u>Forum</u>. Unless the corporation consents in writing to the selection of an alternative forum, the courts of the State of Nevada are the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation; (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the corporation to the corporation or the corporation's stockholders; (iii) any action asserting a claim against the corporation or any director or officer or other employee of the corporation arising pursuant to any provision of the Business Corporation Act, the Articles of Incorporation or the bylaws of the corporation; or (iv) any action asserting a claim against the corporation or any director or officer or other employee of the corporation governed by the internal affairs doctrine.

2.  <u>Amendments</u>. Notwithstanding any other provision of these bylaws, any alteration, amendment or repeal of these bylaws, or the adoption of new bylaws, shall require the approval of the Board or the stockholders of the Corporation as provided by the Articles of Incorporation and applicable law.

3.  <u>Conflicts</u>. These bylaws are subject in all respects to the terms and conditions of the Articles of Incorporation and the Shareholders Agreement or any other stockholders' agreement of the corporation then in effect. In the event of a conflict or inconsistency between these bylaws and (a) the Articles of Incorporation, the terms of the Articles of Incorporation will control and (b) the Shareholders Agreement or any other stockholders' agreement of the corporation then in effect, the terms of the Shareholders Agreement or such stockholders' agreement will control. Nothing in these bylaws are intended to modify, expand or limit the terms and conditions of the Articles of Incorporation, Stockholders Agreement or any stockholders' agreement of the corporation then in effect.

* * * * * *

# EXHIBIT C

Shareholders Agreement

**SHAREHOLDERS AGREEMENT**

**AMONG**

**ELETSON HOLDINGS INC.**

**AND**

**THE SHAREHOLDERS NAMED HEREIN**

dated as of

November 19, 2024

# SHAREHOLDERS AGREEMENT

This Shareholders Agreement (as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein, this "***Agreement***"), dated as of November 19, 2024 (the "***Effective Date***"), is entered into among Eletson Holdings Inc., a Liberian corporation (the "***Company***"), the Plan Majority Shareholder, as defined below, and each Person identified on <u>Schedule A</u> hereto (each, a "***Minority Shareholder***" and, collectively, the "***Minority Shareholders***") and each other Person who after the Effective Date acquires securities of the Company and agrees to become a party to, and bound by, this Agreement by executing a Joinder Agreement. The Plan Majority Shareholder, the Minority Shareholders and their respective Transferees are each referred to herein as a "***Shareholder***" and, collectively, the "***Shareholders***".

## RECITALS

**WHEREAS**, on October 25, 2024 and November 4, 2024 (the "***Order Date***"), the United States Bankruptcy Court for the Southern District of New York entered an opinion and order (Docket Nos. 1212, 1223) confirming the Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors (Docket No. 1132) (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof, the "***Plan***") in the jointly administered chapter 11 cases for Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC, captioned, *In re Eletson Holdings Inc.*, Case No. 23-10322 (JPM) (Bankr. S.D.N.Y.);

**WHEREAS**, in connection with the transactions contemplated by the Plan, the Shareholders acquired shares of the Capital Stock of the Company;

**WHEREAS**, pursuant to the Plan, all current and future Shareholders shall be deemed to become party to this Agreement; and

**WHEREAS**, the Company and the Shareholders desire to enter into this Agreement to set forth their understanding and agreement as to the shares of Capital Stock held by the Shareholders, including the voting and transfer of such shares under the circumstances set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01**    Definitions**.** Capitalized terms used but not defined herein have the respective meanings set forth in <u>EXHIBIT A</u>, which <u>EXHIBIT A</u> is hereby incorporated in its entirety as if set forth in this <u>ARTICLE I</u>.

**Section 1.02**    Interpretation.   For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended,

supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**ARTICLE II**
**MANAGEMENT**

**Section 2.01    Board Composition.**    Each Shareholder shall vote all voting securities (including all voting Shares) owned by such Shareholder or over which such Shareholder has voting control, and shall take all other necessary or desirable actions within his, her, or its control (including in his, her, or its capacity as a Shareholder, director, member of a board committee, officer of the Company, or otherwise), and the Company shall take all necessary or desirable actions within its control, to ensure that:

(a)    the number of directors constituting the board of directors of the Company (each a "***Director***" and, collectively, the "***Board***") initially consists of three (3) Directors, which number may be increased or decreased as the Shareholders of the Company may determine from time to time; and

(b)    the following individuals are elected and continue to serve as Directors:

(i)    one (1) individual designated by the Plan Majority Shareholder (the "***First Plan Majority Shareholder Director***"), who shall initially be Adam Spears;

(ii)    one (1) individual designated by the Plan Majority Shareholder subject to the Requisite Minority Shareholder Consent (the "***Second Plan Majority Shareholder Director***"), who shall initially be Leonard J. Hoskinson; and

(iii)    one (1) individual designated by the Requisite Minority Shareholders (the "***Minority Shareholder Director***"), who shall initially be Timothy B Matthews.

**Section 2.02    Board Size**. The number of Directors of the Board may be increased by a vote of a majority of the existing Board.

**Section 2.03    Removal; Resignation; Vacancies.**

(a)    **Removal of the First Plan Majority Shareholder Director.** The First Plan Majority Shareholder Director may be removed at any time as a Director on the Board (with or without cause) upon, and only upon, the written request of the Plan Majority Shareholder. Each other Shareholder shall vote all voting securities owned by such Shareholder or over which such Shareholder has voting control, and shall take all other necessary or desirable actions within his, her, or its control (including in his, her, or its capacity as a Shareholder, director, member of a board committee, officer of the Company, or otherwise), and the Company shall take all necessary or desirable actions within its control, to remove or replace from the Board such Director upon, and only upon, such written request. Except as provided in the preceding sentence, unless the Plan Majority Shareholder shall otherwise consent in writing, no other Shareholder shall take any action to cause the removal of the First Plan Majority Shareholder Director.

(b)    **Removal of the Second Plan Majority Shareholder Director.** The Second Plan Majority Shareholder Director may be removed at any time as a Director on the Board (with or without

cause) upon, and only upon, the written request of the Plan Majority Shareholder subject to the Requisite Minority Shareholder Consent. Each other Shareholder shall vote all voting securities owned by such Shareholder or over which such Shareholder has voting control, and shall take all other necessary or desirable actions within his, her, or its control (including in his, her, or its capacity as a Shareholder, director, member of a board committee, officer of the Company, or otherwise), and the Company shall take all necessary or desirable actions within its control, to remove or replace from the Board such Director upon, and only upon, such written request. Except as provided in the preceding sentence, unless the Plan Majority Shareholder, subject to the Requisite Minority Shareholder Consent, shall otherwise consent in writing, no other Shareholder shall take any action to cause the removal of the Second Plan Majority Shareholder Director.

(c)     **Removal of Minority Shareholder Director**. The Minority Shareholder Director may be removed at any time as a Director on the Board (with or without cause) upon, and only upon, the written request of the Requisite Minority Shareholders. Each other Shareholder shall vote all voting securities owned by such Shareholder or over which such Shareholder has voting control, and shall take all other necessary or desirable actions within his, her, or its control (including in his, her, or its capacity as a Shareholder, director, member of a board committee, officer of the Company, or otherwise), and the Company shall take all necessary or desirable actions within its control, to remove or replace from the Board the Minority Shareholder Director upon, and only upon, such written request. Except as provided in the preceding sentence, unless the Requisite Minority Shareholders shall otherwise consent in writing, no other Shareholder shall take any action to cause the removal of the Minority Shareholder Director.

(d)     **Resignation.** A Director may resign at any time from the Board by delivering his or her written resignation to the Board. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make it effective.

(e)     **Vacancies**.

(i)     **First Plan Majority Shareholder Director Vacancy**. In the event that a vacancy is created on the Board at any time due to the death, disability, retirement, resignation, or removal of the First Plan Majority Shareholder Director, then the Plan Majority Shareholder shall have the right to designate an individual to fill such vacancy and the Company and each Shareholder (whether in his, her, or its capacity as a Shareholder, director, member of a board committee, officer of the Company, or otherwise) hereby agrees to take such actions as may be necessary or desirable within his, her or, its control (including, in the case of a Shareholder, by voting all voting securities owned by such Shareholder or over which such Shareholder has voting control) to ensure the election or appointment of such designee to fill such vacancy on the Board. In the event that the Plan Majority Shareholder shall fail to designate in writing a representative to fill the vacant First Plan Majority Shareholder Director position on the Board, and such failure shall continue for more than thirty (30) days after notice from the Company to the Plan Majority Shareholder with respect to such failure, then the vacant position shall be filled by an individual designated by the Directors then in office; *provided*, that such individual shall be removed from such position if the Plan Majority Shareholder so directs and simultaneously designates a new Director.

(ii)     **Second Plan Majority Shareholder Director Vacancy**. In the event that a vacancy is created on the Board at any time due to the death, disability, retirement, resignation, or removal of the Second Plan Majority Shareholder Director, then the Plan Majority Shareholder shall have the right to designate an individual to fill such vacancy, subject to the Requisite Minority Shareholder Consent, and the Company and each Shareholder (whether in his, her, or its capacity as a Shareholder,

director, member of a board committee, officer of the Company, or otherwise) hereby agrees to take such actions as may be necessary or desirable within his, her or, its control (including, in the case of a Shareholder, by voting all voting securities owned by such Shareholder or over which such Shareholder has voting control) to ensure the election or appointment of such designee to fill such vacancy on the Board. In the event that the Plan Majority Shareholder, subject to the Requisite Minority Shareholder Consent, shall fail to designate in writing a representative to fill the vacant Second Plan Majority Shareholder Director position on the Board, and such failure shall continue for more than thirty (30) days after notice from the Company to the Plan Majority Shareholder and the Requisite Minority Shareholders with respect to such failure, then the vacant position shall be filled by an individual designated by the Directors then in office; *provided*, that such individual shall be removed from such position if the Plan Majority Shareholder so directs and simultaneously designates a new Director, subject to the Requisite Minority Shareholder Consent.

(iii) **Minority Shareholder Director Vacancy**. In the event that a vacancy is created on the Board at any time due to the death, disability, retirement, resignation, or removal of the Minority Shareholder Director, then the Requisite Minority Shareholders shall have the right to designate an individual to fill such vacancy and the Company and each Shareholder (whether in his, her, or its capacity as a Shareholder, director, member of a board committee, officer of the Company, or otherwise) hereby agrees to take such actions as may be necessary or desirable within his, her or, its control (including, in the case of a Shareholder, by voting all voting securities owned by such Shareholder or over which such Shareholder has voting control) to ensure the election or appointment of such designee to fill such vacancy on the Board. In the event that the Requisite Minority Shareholders shall fail to designate in writing a representative to fill the vacant Minority Shareholder Director position on the Board, and such failure shall continue for more than thirty (30) days after notice from the Company to the Requisite Minority Shareholders with respect to such failure, then the vacant position shall be filled by an individual designated by the Directors then in office; *provided*, that such individual shall be removed from such position if the Requisite Minority Shareholders so direct and simultaneously designate a new Director.

**Section 2.04     Meetings of the Board of Directors**.

(a) **Generally.** The Board shall meet at such time and at such place as the Board may designate. Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Directors participating in the meeting to hear each other, at the offices of the Company or such other place (either within or outside the Republic of Liberia) as may be determined from time to time by the Board. Written notice of each meeting of the Board shall be given to each Director at least 24 hours prior to each such meeting.

(b) **Special Meetings.** Special meetings of the Board shall be held on the call of a majority of the Directors upon at least two (2) Business Days' written notice if the meeting is to be held in person or one (1) Business Day written notice if the meeting is to be held by telephone communications or video conference to the Directors, or upon such shorter notice as may be approved by all the Directors. Any Director may waive such notice as to himself or herself.

(c) **Quorum Requirements.** The presence of a majority of the Directors then in office shall constitute a quorum. If a quorum is not achieved at any duly called meeting, such meeting may be postponed to a time no earlier than 48 hours after written notice of such postponement has been given to the Directors.

**Section 2.05     Compensation; No Employment**.

(a) **Compensation of Directors.** The Company and each Shareholder acknowledges and agrees that:

(i) Each Director shall not receive compensation for his or her service as a Director to the Company or any Company Subsidiary; except as otherwise agreed between such Director and the Company pursuant to a separate written agreement.

(ii) Nothing contained in this <u>Section 2.05</u> shall be construed to preclude any Director from serving the Company or any Company Subsidiary in any other capacity and receiving reasonable compensation for such services.

(b) **No Right of Employment Conferred**. This Agreement does not, and is not intended to, confer upon any Director any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Director.

## ARTICLE III
## TRANSFER

**Section 3.01    Restrictions on Transfer**.

(a) **Restrictions on Transfer.** Each Shareholder acknowledges and agrees that such Shareholder (or any Transferee of Shareholder) shall not Transfer any Capital Stock or Stock Equivalents without the prior written consent of the Board (which the Board may, in its sole discretion, grant, condition, or withhold), except (i) when required of a Drag-along Shareholder pursuant to <u>Section 4.03</u> and (ii) any Transfer by the Plan Majority Shareholder to an Affiliate of the Plan Majority Shareholder.

(b) **Other Transfer Restrictions.** Notwithstanding any other provision of this Agreement, each Shareholder agrees that it will not, directly or indirectly, Transfer any of its Shares:

(i) If prohibited under the securities laws of the Republic of Liberia.

(c) **Joinder Agreement.** No Transfer of Shares pursuant to any provision of this Agreement shall be deemed completed until the Transferee shall have entered into a Joinder Agreement.

(d) **Transfers in Violation of this Agreement.** Any Transfer or attempted Transfer of any Shares in violation of the this Agreement, including any failure of a Transferee, as applicable, to enter into a Joinder Agreement pursuant to <u>Section 3.01(c)</u> above, shall be null and void, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the Shareholder proposing to make any such Transfer shall continue be treated) as the owner of such Shares for all purposes of this Agreement.

## ARTICLE IV
## ADDITIONAL RIGHTS AND OBLIGATIONS OF SHAREHOLDERS AND THE COMPANY

**Section 4.01    Other Business Activities.**    The parties hereto, including the Company, expressly acknowledge and agree that: (i) each Shareholder and its Affiliates are permitted to have, and may presently or in the future have, investments or other business or strategic relationships, ventures, agreements or other arrangements with entities other than the Company or any Company Subsidiary that are engaged in the business of the Company or any Company Subsidiary, or that are or may be competitive with the Company or any Company Subsidiary (any such other investment or relationship, an "***Other Business***"); (ii) none of the Shareholders or their respective Affiliates will be prohibited from pursuing and engaging in any Other Business; (iii) none of the Shareholders or their respective Affiliates

will be obligated to inform the Company or any other Shareholder of any opportunity, relationship or investment in any Other Business (a "**Company Opportunity**") or to present any Company Opportunity to the Company, and the Company hereby renounces any interest in any Company Opportunity and any expectancy that a Company Opportunity will be offered to it; (iv) nothing contained herein shall limit, prohibit or restrict any Director from serving on the board of directors or other governing body or committee of any Other Business; and (v) no other Shareholder will acquire, be provided with an option or opportunity to acquire, or be entitled to any interest or participation in any Other Business as a result of the participation therein of any Shareholder or its Affiliates. The parties hereto expressly authorize and consent to the involvement of any Shareholder and/or its Affiliates in any Other Business; *provided*, that, any transactions between the Company and/or the Company Subsidiaries and an Other Business will be on terms no less favorable to the Company and/or the Company Subsidiaries than would be obtainable in a comparable arm's-length transaction. The parties hereto expressly waive, to the fullest extent permitted by Applicable Law, any rights to assert any claim that such involvement breaches any fiduciary or other duty or obligation owed to the Company or any Shareholder or to assert that such involvement constitutes a conflict of interest by such Persons with respect to the Company or any Shareholder.

Section 4.02    **Levona Claims.** Any decisions related to claims and causes of action with Levona Holdings, Ltd. and its affiliates, including the Plan Majority Shareholder (the "**Levona Claims**"), are required to be made by the Minority Shareholder Director; *provided*, a majority of the Company's Shareholders other than the Plan Majority Shareholder (or any of the Company's shareholders affiliated with the Plan Majority Shareholder) may settle the Levona Claims or direct the actions of the Minority Shareholder Director with respect to the Levona Claims.

Section 4.03    **Drag-along Rights**.

(a)    **Participation.** If the Plan Majority Shareholder (the "**Dragging Shareholder**"), proposes to consummate, in one transaction or a series of related transactions, a Company Sale (a "**Drag-along Sale**"), the Dragging Shareholder shall have the right, after delivering the Drag-along Notice in accordance with Section 4.03(c) and subject to compliance with Section 4.03(d), to require that each other Shareholder (each, a "**Drag-along Shareholder**") participate in such Drag-along Sale on substantially the same terms and conditions as the Dragging Shareholder and in the manner set forth in Section 4.03(b).

(b)    **Sale of Stock; Sale of Assets.** Subject to compliance with Section 4.03(c) and Section 4.03(d):

(i)    If the Drag-along Sale is structured as a Company Sale involving the sale of stock, then each Drag-along Shareholder shall, subject to the terms and conditions of this Section 4.03, sell, with respect to each class or series of Shares proposed by the Dragging Shareholder to be included in the Drag-along Sale, the number of Shares of such class or series equal to the product obtained by multiplying (A) the number of Shares of the applicable class or series of Shares on a Fully Diluted Basis held by such Drag-along Shareholder by (B) a fraction (1) the numerator of which is equal to the number of Shares of the applicable class or series of Shares on a Fully Diluted Basis that the Dragging Shareholder proposes to sell in the Drag-along Sale and (2) the denominator of which is equal to the number of Shares of the applicable class or series of Shares on a Fully Diluted Basis held by the Dragging Shareholder at such time; and

(ii)    If the Drag-along Sale is structured as a sale of all or substantially all of the consolidated assets of the Company and the Company Subsidiaries or as a merger, consolidation, recapitalization, or reorganization of the Company or other transaction requiring the consent or approval of the Shareholders, then notwithstanding anything to the contrary in this Agreement, each Drag-along Shareholder shall, subject to the satisfaction of the conditions set forth in Section 4.03(c) and Section 4.03(d), (A) vote (in person, by proxy, or by written consent, as requested) all of its voting securities

(including any voting Shares) in favor of the Drag-along Sale (and any related actions necessary to consummate such sale) and otherwise consent to and raise no objection to such Drag-along Sale and such related actions and (B) refrain from taking any actions to exercise, and shall take all actions to waive, any dissenters', appraisal, or other similar rights that it may have in connection with such transaction.

(c)     **Drag-along Notice.** The Dragging Shareholder shall exercise its rights pursuant to this Section 4.03 by delivering a written notice (the "***Drag-along Notice***") to the Company and each Drag-along Shareholder, which shall (i) state the name(s) of the Third Party Purchaser; (ii) state the fair market value of the Company as determined by the Third Party Purchaser and the other material terms and conditions of the Drag-along Sale; and (iii) be accompanied by a copy of any form of agreement (or the most recent draft thereof) proposed to be executed in connection therewith.

(d)     **Conditions of Sale.** The obligations of the Drag-along Shareholders in respect of a Drag-along Sale under this Section 4.03 are subject to the satisfaction of the following conditions:

(i)     The consideration to be received by each Drag-along Shareholder shall be the same amount of consideration to be received by the Dragging Shareholder per share of Capital Stock of each applicable class or series.

(ii)     If any Shareholder (including the Dragging Shareholder) is given an option as to the form of consideration to be received, all Drag-along Shareholders shall be given the same option on the same terms.

(iii)     Each Drag-along Shareholder shall execute the applicable purchase agreement (and any related ancillary agreements entered into by the Dragging Shareholder in connection with the Drag-along Sale) and make or provide the same representations, warranties, covenants, indemnities (directly to the Third Party Purchaser and/or indirectly pursuant to a contribution agreement, as required by the Dragging Shareholder), purchase price adjustments, escrows, and other obligations as the Dragging Shareholder makes or provides in connection with the Drag-along Sale.

(iv)     (A) Any Drag-along Shareholder's liability relating to representations, warranties and covenants (and related indemnities) and other indemnification obligations in connection with such Drag-along Sale, shall be several and pro rata, (B) no Drag-along Shareholder shall have any liability for the representations, warranties or covenants of any Person other than itself, and (C) in no event shall the aggregate liability of a Drag-along Shareholder in respect of a Drag-along Sale be more than the consideration actually received by such Drag-along Shareholder in such Drag-along Sale.

(v)     No Drag-along Shareholder shall be required to agree to restrictive covenants in connection with a Drag-along Sale except for any Drag-along Shareholder who is also employed by the Company or its Affiliates.

(vi)     If some or all of the consideration received in connection with the Drag-along Sale is other than cash, then that consideration shall be deemed to have a dollar value equal to the fair market value of that consideration as determined by the Board.

(e)     **Cooperation.**  Subject to the satisfaction of the conditions set forth in Section 4.03(c) and Section 4.03(d), Each Drag-along Shareholder shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Dragging Shareholder.  Further, to ensure compliance with this Section 4.03, subject to the satisfaction of the conditions set forth in Section 4.03(c) and Section 4.03(d), each Drag-along Shareholder hereby unconditionally and irrevocably grants to, and appoints, the Plan

Majority Shareholder and any designee of the Plan Majority Shareholder, as such Drag-along Shareholder's proxy and attorney-in-fact, with full power of substitution, to take the following actions, but only such actions: (i) vote or act by written consent with respect to the Shares held by such Drag-along Shareholder in favor of the Drag-along Sale, and (ii) execute and deliver any documents necessary to consummate such Drag-along Sale. This proxy and power of attorney are coupled with an interest and shall be irrevocable and binding on any person to whom the Drag-along Shareholder may transfer any of their Shares.

    (f)  **Fees and Expenses.** The documented fees and expenses of the Dragging Shareholder (either directly or indirectly by the Company and any Company Subsidiary) incurred in connection with a Drag-along Sale and for the benefit of all Drag-along Shareholders, to the extent not paid or reimbursed by the Company, any Company Subsidiary or the Third Party Purchaser, shall be shared by the Dragging Shareholder and all the Drag-along Shareholders on a pro rata basis, based on the aggregate consideration received by each such Shareholder in the Drag-along Sale (and which shall be reflected in the applicable funds flow in respect of the consummation of such Drag-along Sale).

    **Section 4.04**  **Information Rights.**

    (a)  **Financial Reports**. The Company shall deliver to each Shareholder quarterly and annual financial statements ("***Financial Reports***") if, and only if, such Financial Reports are provided to the Board, in which case such Financial Reports to be delivered to such Shareholder in the same form as the Financial Reports provided to the Board; *provided*, that the Board has not reasonably determined that such Shareholder is a Competitor; *provided, however*, that the Company shall not be obligated under this Section 4.04(a) to provide any information that (i) the Company reasonably determines in good faith to be a trade secret or similar highly confidential information; or (ii) the disclosure of which would reasonably be expected to adversely affect the attorney-client privilege between the Company and its counsel.

    (b)  **Confidentiality**. Each Shareholder agrees that such Shareholder will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor or make decisions with respect to its investment in the Company) any confidential information obtained from the Company, including any Financial Reports and the information contained therein, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 4.04(b) by such Shareholder), (b) is or has been independently developed or conceived by such Shareholder without use of the Company's confidential information, or (c) is or has been made known or disclosed to such Shareholder by a third party without a breach of any obligation of confidentiality such third party may have to the Company; *provided, however*, that an Shareholder may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent reasonably necessary to obtain their services in connection with monitoring its investment in the Company or (ii) as may otherwise be required by law, regulation, rule, court order or subpoena, *provided* that such Shareholder promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

    **Section 4.05**  **Pre-emptive Right**.

    (a)  **Issuance of New Securities.** The Company hereby grants to each Shareholder (each, a "***Pre-emptive Shareholder***") the right to purchase New Securities that the Company may from time to time propose to issue or sell between the date hereof and the consummation of any underwritten public offering pursuant to a registration statement filed in accordance with the Securities Act of 1933, as amended (a "***Public Offering***, in each case in accordance with this Section 4.05.

(b)     **Additional Issuance Notices.**  The Company shall give written notice (an "***Issuance Notice***") of any proposed issuance or sale described in Section 4.05(a) to the Pre-emptive Shareholders within one (1) Business Day following any meeting of the Board (or action by written consent) at which any such issuance or sale is approved. The Issuance Notice shall, if applicable, be accompanied by a written offer from, or summary of terms submitted to, any prospective purchaser seeking to purchase New Securities (a "***Prospective Purchaser***") and shall set forth the material terms and conditions of the proposed issuance or sale, including:

(i)     the number and description of the New Securities proposed to be issued and the percentage of the Company's Shares then outstanding (both in the aggregate and with respect to each class or series of Shares proposed to be issued) that such issuance would represent;

(ii)     the proposed issuance date (the "***Issuance Date***"), which shall be at least twenty (20) days from the date of the Issuance Notice;

(iii)     the proposed purchase price per Share of the New Securities; and

(iv)     if the consideration to be paid by the Prospective Purchaser includes non-cash consideration, the Board's good-faith determination of the fair market value thereof.

(c)     **Exercise of Pre-emptive Rights.**  Each Pre-emptive Shareholder shall for a period of fifteen (15) days following the receipt of an Issuance Notice (the "***Exercise Period***") have the right to elect irrevocably to purchase all or any portion of its Pro Rata Portion of any New Securities, as applicable, at the respective purchase price set forth in the Issuance Notice by delivering a written notice to the Company (an "***Acceptance Notice***") specifying the number of New Securities it desires to purchase. The delivery of an Acceptance Notice by a Pre-emptive Shareholder shall be a binding and irrevocable offer by such Shareholder to purchase the New Securities described therein. The failure of a Pre-emptive Shareholder to deliver an Acceptance Notice by the end of the Exercise Period shall constitute a waiver of its rights under this Section 4.05 with respect to the purchase of such New Securities, but shall not affect its rights with respect to any future issuances or sales of New Securities.

(d)     **Sales to the Prospective Purchaser.**  Following the Issuance Date, the Company shall be free to complete the proposed issuance or sale of any New Securities described in the Issuance Notice with respect to which Pre-emptive Shareholders declined to exercise the pre-emptive right set forth in this Section 4.05 on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of New Securities to be issued or sold by the Company may be reduced); *provided*, that: (i) such issuance or sale is closed within thirty (30) Business Days after the Issuance Date; and (ii) for the avoidance of doubt, the price at which the New Securities are sold to the Prospective Purchaser is at least equal to or higher than the purchase price described in the Issuance Notice. In the event the Company has not sold such New Securities within such time period, the Company shall not thereafter issue or sell any New Securities without first again offering such securities to the Shareholders in accordance with the procedures set forth in this Section 4.05.

(e)     **Closing of the Issuance.**  The closing of any purchase by any Pre-emptive Shareholder shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice. Upon the issuance or sale of any New Securities in accordance with this Section 4.05, the Company shall deliver the New Securities free and clear of any liens, and the Company shall so represent and warrant to the purchasers thereof that such New Securities shall be, upon issuance thereof to each Pre-Emptive Shareholder exercising its right to purchase New Securities (the "***Exercising Shareholders***") and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. The Company, in the discretion of the Board pursuant to Section 5.19, may deliver to each Exercising Shareholder certificates evidencing the New Securities. Each Exercising Shareholder shall deliver to the

Company the purchase price for the New Securities purchased by it by certified or bank check or wire transfer of immediately available funds. Each party to the purchase and sale of New Securities shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including, without limitation, entering into such additional agreements as may be necessary or appropriate.

**Section 4.06    Tag-along Rights**.

(a)    **Participation**. At any time prior to the consummation of a Public Offering, if the Plan Majority Shareholder proposes to Transfer all or any portion of its Shares or Stock Equivalents pursuant to a transaction or series of transaction in which the Plan Majority Shareholder does not exercise its drag-along rights in accordance with Section 4.03 (for purposes of this Section 4.06, a "***Tag-along Sale***"), then the Plan Majority Shareholder shall follow the procedures set forth in this Section 4.06.

(b)    **Procedures.** The Plan Majority Shareholder shall deliver notice of such intended Tag-along Sale (a "***Tag-along Notice***") to each other Shareholder (each, a "***Tag-along Shareholder***") and each Tag-along Shareholder shall have the option, exercisable in its sole discretion, to participate in the Tag-along Sale at the offered price and on the offered terms set forth in the Tag-along Notice by providing written notice (a "***Tag-along Election***") to the Plan Majority Shareholder within five (5) Business Days of its receipt of the Tag-along Notice. Each electing Tag-along Shareholder shall be entitled to include in the Tag-along Sale the same portion of its Shares or Stock Equivalents as the Plan Majority Shareholder is including in the Tag-along Sale (the "***Tag-along Interest***"). Upon receipt of any Tag-along Election from a Tag-along Shareholder, the Plan Majority Shareholder shall cause the potential purchaser of the Plan Majority Shareholder's Shares or Stock Equivalents to purchase from such Tag-along Shareholder the Tag-along Interest. If the aggregate amount of Shares or Stock Equivalents proposed to be Transferred by the Plan Majority Shareholder and all Tag-along Shareholders exceeds the aggregate amount of Shares or Stock Equivalents the potential purchaser is willing to purchase, then each of the Plan Majority Shareholder and the Tag-along Shareholders shall reduce, to the extent necessary, the portion of their respective Shares or Stock Equivalents to be Transferred pursuant to this Section 4.06 on a pro rata basis. At the time of consummation of the Tag-along Sale, the Plan Majority Shareholder shall cause the purchaser to remit directly to each such Tag-along Shareholder that portion of the sale proceeds to which such Tag-along Shareholder is entitled by reason of such Tag-along Shareholder's participation in the Tag-along Sale. Each Tag-along Shareholder shall pay its pro-rata share of any costs of the transaction that are not otherwise paid by the Company, and costs incurred by any Tag-along Shareholder on such Tag-along Shareholder's own behalf are not treated as costs of the transaction. In furtherance, and not in limitation, of the foregoing, in connection with any Tag-along Sale, each Tag-along Shareholder will execute all documents containing such terms and conditions as those executed by the Plan Majority Shareholder that are reasonably necessary to effect the Tag-along Sale; provided, however, that: (i) the liability of the Plan Majority Shareholder and the Tag-along Shareholders shall be several and not joint; (ii) neither the Plan Majority Shareholder nor any Tag-along Shareholder shall have any liability for any breaches of the representations, warranties or covenants of any Tag-along Shareholder other than itself and, subject to clause (iii) of this Section 4.06(b), the Company; (iii) any obligations of the Plan Majority Shareholder or any other Tag-along Shareholder under the agreement governing the Tag-along Sale and any related escrow agreement shall be borne pro rata among the Plan Majority Shareholder and such Tag-along Shareholders based on the proceeds and assets payable to the Plan Majority Shareholder and such Tag-along Shareholders pursuant to the Tag-along Sale (other than any such obligations that relate specifically to a particular Tag-along Shareholder's Shares or Stock Equivalents, which obligations shall be borne solely by such Tag-along Shareholder); (iv) each Tag-along Shareholder shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Shares or Stock Equivalents, authorization, execution and delivery of relevant documents, enforceability of such documents against the Tag-along Shareholder, and other matters relating to such Tag-along Shareholder; (v) in no event shall the aggregate liability of a Tag-along Shareholder exceed the

actual proceeds and assets received by each such Tag-along Shareholder in the Tag-along Sale, except in the case of fraud by such Tag-along Shareholder; and (vi) if any Tag-along Shareholder is given an option as to the form of consideration to be received, all other Tag-along Shareholders shall be given the same option on the same terms.

### Section 4.07     Additional Covenants.

(a)     **No Additional Capital Contributions.**  No Shareholder shall be required to make any additional capital contributions to the Company. Any future capital contributions made by any Shareholder shall only be made with the consent of the Board and in connection with an issuance of Shares made in compliance with <u>Section 4.05</u>. No Shareholder shall be required to lend any funds to the Company and no Shareholder shall have any personal liability for the payment or repayment of any capital contribution by or to any other Shareholder.

(b)     **Insurance.**  The Company shall purchase and maintain, at its expense, insurance to cover all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "***Losses***") incurred by any Covered Person for any breach or alleged breach by such Covered Person of such Covered Person's duties with respect to the Company in such amount and with such deductibles as the Board may reasonably determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person by the Company as set forth in the Bylaws, including the right to be reimbursed or advanced expenses thereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses. The Company and each Shareholder agree that each Covered Person is an express third-party beneficiary of the terms of this <u>Section 4.07(b)</u>.

(c)     **Registration Rights.**  Upon the written request of the Plan Majority Shareholder, the Company shall enter into a registration rights agreement by and among the Company and the Shareholders (the "***Registration Rights Agreement***"), in a form reasonably satisfactory to the Board, which Registration Rights Agreement shall provide (i) the Plan Majority Shareholder with two demand registrations and unlimited piggyback registration rights, (ii) the other Shareholders with customary piggyback rights, and (iii) that the Company shall not provide registration rights to any Person that are superior in any way to those to be held by the Plan Majority Shareholder.

## ARTICLE V
## MISCELLANEOUS

**Section 5.01     Expenses.**     Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors, and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 5.02     Further Assurances.**     In connection with this Agreement and the transactions contemplated hereby, the Company and each Shareholder hereby agrees, at the request of the Company or any other Shareholder, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 5.03     Notices.**     All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered

by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 5.03</u>):

If to the Company:        Eletson Holdings Inc.
c/o Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, NY 10119
<u>E-mail</u>:
bkotliar@teamtogut.com;
kortiz@teamtogut.com
<u>Attention</u>:
Bryan Kotliar
Kyle Ortiz

with a copy to:        Plan Majority Shareholder
c/o 145 Adelaide Street West
Fourth Floor
Toronto, ON M5H4E5
Canada
<u>Email</u>:
adam@ace148.com;
ml@murchinsonltd.com
<u>Attention</u>:
Adam Spears
Mark Lichtenstein

with a copy to:        Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335,
New York, NY 10119
<u>E-mail</u>:
bkotliar@teamtogut.com;
kortiz@teamtogut.com
<u>Attention</u>:
Bryan Kotliar
Kyle Ortiz

with a copy to:        Legal Scale, LLP
2 Park Avenue, 20th Floor,
New York, NY 10016
<u>E-mail</u>:
neil@legalscale.com;
mehak@legalscale.com
<u>Attention</u>:
Neil ODonnell
Mehak Rashid

| If to the Minority Shareholders: | The respective addresses of the Minority Shareholders as set forth in Schedule A. |
|---|---|

**Section 5.04   Headings.**   The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

**Section 5.05   Severability.**   If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 5.06   Entire Agreement.**   This Agreement, together with the Articles of Incorporation, the Bylaws and any Joinder Agreements executed after the date hereof, and all related Exhibits and Schedules hereto and thereto constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

**Section 5.07   Successors and Assigns; Assignment.**   Subject to the rights and restrictions on Transfers set forth in this Agreement, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement may not be assigned by any Minority Shareholder except as provided in this Agreement (or as otherwise consented to in a prior writing by the Plan Majority Shareholder) , or by the Plan Majority Shareholder except as provided in this Agreement (or after receipt of the Requisite Minority Shareholder Consent), and any such assignment in violation of this Agreement shall be null and void; *provided,* that (i) any Minority Shareholder may assign this Agreement and any or all rights or obligations hereunder to any Affiliate of such Minority Shareholder upon such Minority Shareholder providing written notice to the Company seven (7) Business Days prior to the assignment and (ii) the Plan Majority Shareholder may assign this Agreement and any or all rights or obligations hereunder to any Affiliate of the Plan Majority Shareholder.

**Section 5.08   No Third-Party Beneficiaries.**   Except as otherwise set forth herein (including in <u>Section 4.07(b)</u>), this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 5.09   Termination and Amendment.**   All rights and obligations of each Shareholder contained herein shall survive indefinitely until, by their respective terms, they are no longer applicable. No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Shareholders holding a majority of the issued and outstanding Shares. Any such written amendment or modification will be binding upon the Company and each Shareholder.

**Section 5.10   Waiver.**   No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring

before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. For the avoidance of doubt, nothing contained in this <u>Section 5.10</u> shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 5.11    Governing Law.**    All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada, without giving effect to any choice or conflict of law provision or rule (whether of the Republic of Liberia, the State of Nevada or any other jurisdiction).

**Section 5.12    Submission to Jurisdiction.**    The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the courts of the State of Nevada, so long as one of such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Nevada.

Each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice, or other document by certified or registered mail to the address set forth in <u>Section 5.03</u> shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Waiver of Jury Trial.**    Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 5.14    Minority Shareholder Complaints**. In the event a Minority Shareholder intends to bring any suit, action, or proceeding against the Company, any of the Directors, or any of the officers of the Company (a "Shareholder Claim"), the Minority Shareholder must first submit a detailed description of the Shareholder Claim (a "Shareholder Complaint") to the Board. The Second Plan Majority Shareholder Director shall investigate, review, and assess the merits of the Shareholder Claim and shall have sixty (60) days (the "Claim Review Period") from receipt of the Shareholder Complaint to approve the Shareholder Claim. No Minority Shareholder shall initiate any suit, action, or proceeding related to a Shareholder Claim unless and until the Second Plan Majority Shareholder Director has reviewed and approved such Shareholder Claim. If the Second Plan Majority Shareholder Director disapproves a Shareholder Claim, or if the Claim Review Period for a Shareholder Claim expires, no Minority Shareholder shall initiate any suit, action, or proceeding related to such Shareholder Claim.

**Section 5.15    Equitable Remedies.**    Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a

court of competent jurisdiction (without any requirement to post bond). Notwithstanding the foregoing, Drag-along Shareholders shall waive any rights they may have to any equitable relief in connection with actions taken by the Dragging Shareholder pursuant to Section 4.03.

Section 5.16    **Attorney's Fees.**   In the event that any party hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, if, and only if, the prevailing party has obtained a final and non-appealable decision in its favor as determined by a court or other body of competent jurisdiction, then the prevailing party in the suit, action, or proceeding shall be entitled to be reimbursed by the other party, in addition to all other damages to which it may be entitled, for the costs incurred by such party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

Section 5.17    **Remedies Cumulative.**   The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

Section 5.18    **Counterparts.**   This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in two (2) or more counterparts, all of which shall constitute one and the same instrument. Any such counterpart, to the extent delivered by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail (any such delivery, an "***Electronic Delivery***") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or to any signed agreement or instrument entered into in connection with this Agreement, or any amendments hereto or thereto, shall re-execute the original form of this Agreement, or the applicable signed agreement, instrument or amendment, and deliver such form to all other parties hereto or thereto. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining a party's intent or the effectiveness of such signature.

Section 5.19    **Legend.**   None of the Shares shall be certificated unless the Board so determines. In the event any of the Shares are certificated, in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Capital Stock shall bear a legend substantially in the following form:

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND ITS SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH SHAREHOLDERS AGREEMENT.

> THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF THE REPUBLIC OF LIBERIA, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED,

OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 5.20    Irrevocable Proxy and Power of Attorney.** In addition to the proxy and power-of-attorney granted to the Plan Majority Shareholder pursuant to <u>Section 4.03(e)</u>, each Minority Shareholder hereby appoints the Plan Majority Shareholder and any designee of the Plan Majority Shareholder, and each of them individually, its proxies and attorneys-in-fact, with full power of substitution and resubstitution, to vote or act by written consent with respect to such Minority Shareholder's Shares, or to execute, acknowledge, verify, swear to, deliver, record, and file, in its or its assignee's name, place, and stead any agreement or instrument in accordance with the terms of this Agreement to effect: the obligations of the Minority Shareholders contained in ARTICLE II. This proxy and power of attorney is given to secure the performance of the duties of the Minority Shareholders under this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

THE COMPANY:

**ELETSON HOLDINGS INC.**

By: _Adam Spears_
Adam Spears (Nov 1, 2024 12:55 EST)

Name: Adam Spears
Title: Chief Executive Officer

## SCHEDULE A

## Schedule of Minority Shareholders

DuPont Capital Management
c/o Joe Maurer
Chestnut Run Plaza
Building C735-1
974 Centre Road
Wilmington, DE 19805
Joseph.J.Maurer@DuPontCapital.Com

# EXHIBIT A

## DEFINITIONS

"*Affiliate*" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person, including any partner, member, stockholder, or other equity holder of such Person or manager, director, officer, or employee of such Person. For purposes of this definition, "*control,*" when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "*controlling*" and "*controlled*" shall have correlative meanings.

"*Applicable Law*" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"*Articles of Incorporation*" means the Restated Articles of Incorporation of the Company, as filed on June 29, 2007 with the Republic of Liberia, as amended by the Articles of Amendment filed on June 29, 2018, and as amended, modified, supplemented, or restated from time to time. For the avoidance of doubt, pursuant to the Plan the Company shall file an Articles of Amendment and Restated Articles of Incorporation in such form as approved in the Plan.

"*Business Day*" means a day other than a Saturday, Sunday, or other day on which commercial banks in Republic of Liberia are authorized or required to close.

"*Bylaws*" means the Bylaws of the Company, dated as of the Effective Date, as amended, modified, supplemented or restated from time to time.

"*Capital Stock*" means the Common Stock, and any other class or series of capital stock or other equity securities of the Company, whether authorized as of or after the date hereof.

"*Common Stock*" means the voting Common Stock, par value US$0.00001 per share, of the Company and any securities issued in respect thereof, or in substitution therefor, in connection with any stock split, dividend or combination, or any reclassification, recapitalization, merger, consolidation, exchange, or similar reorganization.

"*Company Sale*" means: (a) the sale or exchange, in one or a series of transactions, of all or substantially all of the consolidated assets of the Company and the Company Subsidiaries to a Third Party Purchaser; (b) the sale or exchange, in one or a series of transactions, resulting in no less than a majority of the Capital Stock being held by a Third Party Purchaser; or (c) a merger, consolidation, recapitalization, or reorganization of the Company with or into a Third Party Purchaser that results in the inability of the Shareholders to designate or elect a majority of the board of directors (or its equivalent) of the resulting entity or its parent company.

"*Company Subsidiary*" means a Subsidiary of the Company.

"*Competitor*" means a Person engaged, directly or indirectly (including through any partnership, limited liability company, corporation, joint venture or similar arrangement (whether now existing or

formed hereafter)), in the business of the Company, but shall not include the Plan Majority Shareholder or its Affiliates.

"***Covered Person***" means each Director or officer of the Company.

"***Fully Diluted Basis***" means, as of any date of determination: (a) with respect to all Capital Stock, all issued and outstanding Capital Stock of the Company and all Capital Stock issuable upon the exercise or conversion of any outstanding Stock Equivalents as of such date, whether or not such Stock Equivalent is at the time exercisable or convertible; or (b) with respect to any specified type, class, or series of Capital Stock, all issued and outstanding shares of Capital Stock designated as such type, class, or series and all such designated shares of Capital Stock issuable upon the conversion or exercise of any outstanding Stock Equivalents as of such date, whether or not such Stock Equivalent is at the time exercisable or convertible.

"***Governmental Authority***" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"***Joinder Agreement***" means the Joinder Agreement to this Agreement in form and substance attached hereto as <u>Exhibit B</u>.

"***New Securities***" means any newly issued Shares, Stock Equivalents or indebtedness; *provided*, that the term "New Securities" shall not include any Shares, Stock Equivalents or indebtedness issued by the Company in connection with: (A) a grant to any existing or prospective service providers, in each case approved by the Board and pursuant to equity-based plans or other compensation arrangement; (B) the conversion or exchange of any Stock Equivalents into Shares; (C) any acquisition (in whatever form, including through merger, consolidation or business transaction) by the Company or any Company Subsidiary of any equity interests, assets, properties or business of any Person; (D) any transaction or series of related transactions involving a Company Sale; (E) any Public Offering; or (F) any subdivision of Shares (by a split of Shares or otherwise), payment of distributions or any similar recapitalization.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"***Plan Majority Shareholder***" means such Shareholder holding, either by itself, or together with its Affiliates, greater than 50% of the Company's Capital Stock outstanding as of the Order Date.

"***Pro Rata Portion***" means a fraction determined by dividing (A) the number of outstanding Shares owned by such Pre-emptive Shareholder immediately prior to such issuance by (B) the total number of outstanding Shares owned by all Pre-emptive Shareholders on such date immediately prior to such issuance.

"***Requisite Minority Shareholder Consent***" the consent of the Requisite Minority Shareholders, such consent to not be unreasonably withheld, conditioned or delayed; *provided*, that if (i) any provision under this Agreement provides that an action to be taken by the Plan Majority Shareholder is subject to the Requisite Minority Shareholder Consent, (ii) the Plan Majority Shareholder has requested such consent from the Requisite Minority Shareholders in connection with such action and (iii) the Requisite Minority Shareholders have not affirmatively or negatively responded to such request within five (5) Business Days, then the Requisite Minority Shareholder Consent shall be deemed to have been provided with respect to such action to be taken by the Plan Majority Shareholder.

"**Requisite Minority Shareholders**" means the Minority Shareholders holding a majority of the issued and outstanding Shares of Capital Stock held by all of the Minority Shareholders.

"**Shares**" means shares of (a) Common Stock and (b) any other Capital Stock, in each case together with any Stock Equivalents thereon, purchased, owned, or otherwise acquired by a Shareholder as of or after the date hereof, and any securities issued in respect of any of the foregoing, or in substitution therefor, in connection with any stock split, dividend or combination, or any reclassification, recapitalization, merger, consolidation, exchange, or similar reorganization.

"**Stock Equivalents**" means any security or obligation that is by its terms, directly or indirectly, convertible into or exchangeable or exercisable for Shares, and any option, warrant, or other right to subscribe for, purchase, or acquire Shares or Stock Equivalents (disregarding any restrictions or limitations on the exercise of such rights).

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"**Third Party Purchaser**" means any Person who, immediately prior to the contemplated transaction: (a) does not directly or indirectly own or have the right to acquire any outstanding Capital Stock (or applicable Stock Equivalents); or (b) or is not an Affiliate of the Plan Majority Shareholder.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation, or similar disposition of, any shares of Capital Stock or Stock Equivalents owned by a Person or any interest (including a beneficial interest) in any Capital Stock or Stock Equivalents owned by a Person. "**Transfer**", when used as a noun, shall have a correlative meaning.

"**Transferee**" means a recipient of, or proposed recipient of, a Transfer.

## EXHIBIT B

## FORM OF JOINDER AGREEMENT

Reference is hereby made to the Shareholders Agreement, dated as November 19, 2024, (as amended from time to time, the "**Shareholders Agreement**"), by and among Eletson Holdings Inc, a company organized under the laws of the Republic of Liberia, Plan Majority Shareholder and the Minority Shareholders. Pursuant to and in accordance with Section 3.01(c) of the Shareholders Agreement, the undersigned hereby agrees that upon the execution of this Joinder Agreement, it shall become a party to the Shareholders Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Shareholders Agreement as though an original party thereto and shall be deemed to be a Shareholder of the Company for all purposes thereof.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Shareholders Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of [DATE].

[TRANSFEREE SHAREHOLDER]

By_____

Name:
Title: