IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **KITHNOS SPECIAL MARITIME ENTERPRISE, ELETSON HOLDINGS INC., ELETSON CORPORATION, ELETSON GAS LLC,** § § § § § | | |
| *Plaintiffs*, § | | |
| § | | |
| v. § | | |
| § | | |
| **M/V KITHNOS (IMO 9711523), her engines, tackle, equipment, and appurtenances**, *in rem*, § § § | C.A. No. 2:25-cv-00042 | |
| § | | |
| and § | In Admiralty, Rule 9(h) | |
| § | | |
| **FAMILY UNITY TRUST COMPANY, GLAFKOS TRUST COMPANY, LASSIA INVESTMENT COMPANY, ELAFONISSOS SHIPPING CORPORATION, KEROS SHIPPING CORPORATION, VASSILIS HADJIELEFTHERIADIS, LASKARINA KARASTAMATI, VASSILIS E. KERTSIKOFF, VASILEIOS CHATZIELEFTHERIADIS, KONSTANTINOS CHATZIELEFTHERIADIS, IOANNIS ZILAKOS, ELENI KARASTAMATI, PANAGIOTIS KONSTANTARAS, EMMANOUIL ANDREOULAKIS, ELENI VANDOROU,** *in personam* § § § § § § § § § § § § § § § § | | |
| *Defendants*. § | | |

**KITHNOS SPECIAL MARITIME ENTERPRISE'S (1) RESPONSE IN OPPOSITION TO CUSTODIAN'S EMERGENCY EX PARTE MOTION SEEKING AUTHORITY TO REMOVE AND REPLACE THE MASTER OF THE *M/V KITHNOS* AND (2) CROSS-MOTION TO DISQUALIFY NATIONAL MARITIME SERVICES, INC. AS <u>SUBSTITUTE CUSTODIAN</u>**

COMES NOW, Kithnos Special Maritime Enterprise ("Claimant"), as Claimant of the M/T KITHNOS and her tackle, equipment, and appurtenances (the "Vessel"), by its attorneys Royston, Rayzor, Vickery & Williams, L.L.P., and, subject to its Supplemental Rule E(8) restricted

appearance, files this (1) Response in Opposition to Custodian's Emergency *Ex Parte* Motion Seeking Authority to Remove and Replace the Master of the M/T KITHNOS and (2) Cross-Motion to Disqualify National Maritime Services, Inc. as Substitute Custodian and would respectfully show as follows:

## I.
### INTRODUCTION

National Maritime Services, Inc. ("NMS"), the Court-appointed substitute custodian, seeks extraordinary relief against Captain Konstantinos Manolarakis ("Master")—namely, the complete removal and replacement of the Master—on the grounds that the Master purportedly failed to provide certain documents and did not acquiesce to wide-ranging demands that resemble Interrogatories and Requests for Production of Documents, under the pretense of vessel safety.

The forced removal of the Master sought by NMS imposes immediate operational burdens on the Vessel, disrupts the established onboard command structure, and jeopardizes the continuity of safe operations. It is particularly troubling given that the Vessel is in ballast (without cargo), is fully equipped and staffed with a properly trained and competent crew, has recently passed a United States Coast Guard Certificate of Compliance inspection, and poses no credible risk to her crew or property.

In effect, this extraordinary measure—based on overstated, unjustified, and unfounded safety concerns—undermines both the Master's lawful authority and sets a dangerous precedent whereby a substitute custodian can leverage unsubstantiated assertions to achieve unprecedented control over a Vessel's command. This concern is particularly prescient in the context of a Rule D possessory action, ***where the possession and operational command of the Vessel is in dispute***. Here, the factual record and settled admiralty practice relating to the role and responsibility of substitute custodians do not justify such drastic and practically unheard-of measures.

First, there is no credible evidence that the M/T KITHNOS is currently unsafe, at imminent risk, or being mismanaged by the Master. Second, Claimant, through the Master and vessel managers, has provided to the substitute custodian and/or offered relevant information and assurances directly related to safety, while objecting to extraneous commercial/financial/operational requests for commercially-sensitive information that exceed the scope of legitimate safety inquiries. Third, removal of a vessel's Master—particularly over discovery disputes—represents an extraordinary remedy that goes far beyond the typical authority exercised by a substitute custodian. For all of these reasons, Claimant respectfully request that the Court deny the requested relief.

Additionally, Claimant also requests that NMS be disqualified from acting as a substitute custodian. Based on the record and evidence, it has become abundantly clear that NMS is merely acting as a "tool" for the Plaintiffs to seek technical and operational information relating to the underlying Rule D possessory action.

Notwithstanding Claimant's concerns regarding the overbreadth and commercially-sensitive nature of NMS's requests, Claimant has nevertheless offered to share additional commercially-sensitive information with NMS if such information could be protected via a reasonable confidentiality clause. NMS has inexplicably rejected this attempt at compromise and now solely seeks the extraordinary remedy of replacing the Vessel's Master with another captain under the control of NMS – and, effectively, Plaintiffs, who retained NMS's substitute custodial services and presumably are paying NMS's fees. Given that control of the Vessel is the crux of this dispute, and in view of NMS's conduct to date and its Motion's singular request to effect a change of the command of the Vessel, NMS's motives are clearly in question, and NMS is not fit

to serve as a neutral substitute custodian and should be removed and replaced with a mutually-agreeable substitute custodian.

## II.
### FACTUAL BACKGROUND

**A.     Procedural History and Substitute Custodian Appointment**

On or about February 5, 2025, the Court appointed NMS as substitute custodian of the M/T KITHNOS (the "Vessel"). Under that appointment, NMS stands in for the U.S. Marshals solely to ensure the Vessel's safekeeping—i.e., that the Vessel does not pose a risk to the environment, the port, or her crew while under arrest, and that the Vessel remains in the district subject to the Court's orders.

**B.     Sweeping Requests Unrelated to Immediate Safety**

Shortly after the Vessel's arrest, NMS and its retained consultant, Minton, Treharne & Davies ("MTD"), issued broad requests for documentation. While Claimant agreed to provide (and has provided) essential information on the Vessel's cargo tanks condition, NMS demanded additional material—such as four months of compressor logs, multiple sets of prior cargo documents, insurance policies, financial data, crew employment contracts, and other commercially sensitive or non-safety records. Claimant timely raised valid objections that many items were unrelated to present safety concerns and thus exceeded the bounds of typical custodian inquiries.

Noticeably absent from the declaration of Mr. Swimmer, but tellingly of the true intentions of NMS, is the original set of overbroad document requests he presented on February 11, 2025:

> As court-appointed substitute custodian of the arrested vessel Kithnos, we have retained Minton, Treharne & Davies ("MTD") to provide specific expertise and to oversee Kithnos' tanks and their respective cargo during the period of arrest. To assist MTD in understanding the ship's current status and recent cargo history, we request you provide the following information/documents:
>
> 1. A brief description of the cargo reliquefaction plant – for example, single stage seawater cooled or other.

2. A general arrangement plan.
3. International Certificate for Carriage of Liquefied Gas.
4. Bills of Lading for all cargo transported during the past four months.
5. Certificates of Quality (or Analysis) for all cargo carried in the past four months.
6. Particulars of tank cleaning/purging/change of grade (if any) in the past four months.
7. From the Gas Engineer, Compressor Log Sheets for the past four months.
8. From the Gas Engineer, Cargo Care Logs – from which tanks were vapors drawn, to which tanks was the condensate returned and through which lines – top spray/bottom spray/etc.
9. From the Gas Engineer, provide the Compressor Log Sheets and Cargo Care Log on a weekly basis – every Monday from now on.

This request relates to the safety of the subject vessel's tanks and cargo. Your prompt action is demanded.

*See* **Exhibit 1** (E-Mail from Alan Swimmer to Vessel dated February 11, 2025 at 5:07 PM)

Several hours later, Mr. Swimmer followed-up with another even more sweeping set of requests, which clearly undermine his purported concerns for safety, with the most egregious examples emphasized:

As court-appointed substitute custodian of the arrested vessel Kithnos, we request the following items:

DOCUMENTS
Insurance documentation for all coverage presently in effect
- Protection & Indemnity (including MLC A.25 & A.4.1)
- Hull & Machinery
- Pollution
- Wreck removal
- COFR and related WQIS

***Employment contract for each crew member***
***Detailed schedule of most-recent crew compensation remittances***

Classification Society Certification (including all endorsement pages)
Classification Society survey schedule

Cargo Ship Safety Certificate (CSSC)
Vessel Response Plan (VRP) including USCG approval
International Anti-fouling System (IAFS) Certificate plus declaration

International Ship Security Certificate (ISSC)

> International Safety Management Certification (SMC)
> Maritime Labor Certificate (MLC)
> Declaration of Maritime Labor Compliance (DMLC) Parts 1 & 2
>
> Certificate of Compliance from flag state
> Paperwork relating to recent USCG inspection, including 835, if applicable
>
> OTHER
> The vessel is expected to remain under arrest at its present anchorage for several months. ***We may consider reducing costs by repatriating unnecessary crew***. Provide your input as to which positions are unnecessary and can be eliminated under the circumstances.
>
> ***Onboard cash currency***, count certified by you and witnessed by our onboard watchman, together with copies of disbursement receipts.
>
> ***Create a separate email account, and provide access to same, for the onboard gas engineer***. This will be utilized for periodic correspondence with our cargo consultants, Minton, Treharne & Davies. We will send an initial request for cargo-specific information under separate cover.
>
> This request relates to the safety and security management of the subject vessel, in addition to the ***potential creation of operational efficiencies***. Your prompt action is demanded.

*See* **Exhibit 2** (E-Mail from Alan Swimmer to Vessel dated February 11, 2025 at 10:15 PM) (emphases added). Due to the nature of these document productions, the Master justifiably sought legal counsel. Unsatisfied with the lack of response, Mr. Swimmer cast another line:

> Any concern relating to our assessment of Kithnos' term of arrest should not affect the safety of vessel or crew. The residual cargo is potentially unsafe and could ultimately lead to severe vessel damage, or explosion, if not properly stored. The requested information is intended to provide assurance, after analysis, that an adverse onboard event will not occur. Accordingly, we demand that you instruct your crew to deliver the cargo information that was requested below no later than 1200 Central Time February 14, 2025, and every Monday thereafter (as applicable).

*See* **Exhibit 3** (E-Mail from Alan Swimmer to Vessel dated February 13, 2025 at 4:54 AM). Claimant then responded, pointing out the contradictory position of needing to reduce crewmembers while consistently voicing "concerns" about safety:

> The safety of vessel and crew is always our primary concern.
> The vessel is in ballast condition under vapours of last cargo.

> The Master, officers and crew are of course well informed and self sufficient on the correct handling of the vapours of the last cargo carried.
> Master, officers and crew exercise due diligence in order to avoid any unsafe circumstances and ensure the safety of the crew and vessel and protection of the environment, without compromise.
> Most if not all of the documents requested appear unrelated to matters of safety.
> What is more concerning however is the apparent conflict between the arresting parties' purported safety awareness albeit, at the same time, their thoughts to cut down vessel's crew.
> For the above reasons, you would be kindly requested to liaise in due course with the vessel's attorneys in Texas who will be instructed to apply to Court to release her from this wrongful arrest.
> Until then, may we suggest that you refrain from dispatching "demands" to the Master.
> We will revert with the contact details of the vessel's attorneys in Texas.

*See* **Exhibit 4** (E-Mail from Lazaros Skoularikos to Alan Swimmer dated February 13, 2025)

At this point, NMS—undoubtedly at the behest of Plaintiffs—sought legal counsel who conferred with the undersigned to reduce the requests as follows:

> As discussed, the following is a modified list of documents requested by Denis McGrath in order to advise regarding the safety of the cargo:
>
> 1. A brief description of the cargo reliquefacation plant – for example single stage seawater cooled or other.
>
> 2. Copies of the Bills of Lading for the cargoes transported during the past two months.
>
> 3. From the Gas Engineer, Compressor Log Sheets for the past two months.
>
> 4. From the Gas Engineer, Cargo Care Logs – from which tanks were vapors drawn, to which tanks was the condensate returned and through which lines – top spray/bottom spray/etc. for the past two months.
>
> 5. From the Gas Engineer, provide the Compressor Log Sheets and Cargo Care Log on a weekly basis – say every Monday.
>
> Hopefully, this list can be agreed upon and we can avoid having to involve the Court.
>
> It was a pleasure speaking with you this evening. Thank you for taking my call and I look forward to discussing this matter tomorrow.

*See* **Exhibit 5** (E-Mail from Kelly Haas to Dimitri Georgantas dated February 14, 2025). After NMS provided additional explanations as to *why* the specific documents were being requested, Claimant provided a substantive response:

> We are following up on previous correspondence to respond to the custodian's request for information relating to the vessel's safety.
>
> All personnel on board Kithnos, officers and crew, are experienced and well qualified having deep knowledge of cargo handling on gas carriers as per Eletson's longstanding track record and IMO standards.
>
> All equipment on board the Kithnos and in particular all cargo related equipment is in perfect working condition.
>
> Also, the vessel is in ballast condition under vapours of last cargo so no cargo safety risks exist. However, in the spirit of cooperation see our answers to your questions below.
>
> **1. A brief description of the cargo reliquefication plant – for example single stage seawater cooled or other.**
>
> Quote
>
> | **Reliquification Plant** | | | |
> |---|---|---|---|
> | 8.17 | Number and capacity of compressors: | 3 | 1,200 Cu. Metres/Hour |
> | 8.18 | Manufacturer/type of compressors: | Burckhardt / Reciprocating | |
> | 8.19 | Coolant type: | Seawater / R1270 (Propylene) for Ethylene cargo | |
> | 8.20 | Max % Ethane the re-liquefaction plant can handle: | 100 % | |
>
> Unquote
>
> **2. Copies of the Bills of Lading for the cargoes transported during the past two months.**
>
> Bill of Lading contains confidential commercial details which cannot be shared without consent of the concerned parties and are not related with the safety of the cargo. In any case, the ship has been carrying VCM exclusively last few months.
>
> **3. From the Gas Engineer, Compressor Log Sheets for the past two months.**

Compressors log sheets from the ship's previous voyages are irrelevant with respect to the safety of the vessel at her current ballast condition. However, you can find below cargo tanks temperature and pressure daily log since departure from last discharge port (22/01/2025 till today) which establishes that there are no risks or concerns related to the safety of the cargo operation.

**4. From the Gas Engineer, Cargo Care Logs – from which tanks were vapors drawn, to which tanks was the condensate returned and through which lines – top spray/bottom spray/etc. for the past two months.**

In the last few months, the Kithnos has been loading one homogeneous cargo always evenly spread in all cargo tanks. Hence, vapors drawn from all cargo tanks and the condensate returned into all cargo tank through the dedicated lines.

**5. From the Gas Engineer, provide the Compressor Log Sheets and Cargo Care Log on a weekly basis – say every Monday.**

The Kithnos is in ballast condition, under vapours of last cargo, liquid free. During idle period, in accordance with thermodynamic properties of the last cargo and the ship's specifications (semi pressurize gas carrier), cargo compressors are not used. We can share cargo tanks temperature and pressure log on a weekly basis until the vessel is released.

Thank you for your attention to the above and if you and/or Denis have any questions please let us know.

*See* **Exhibit 6** (E-Mail from Dimitri Georgantas to Kelly Haas on February 18).

C.   **The Vessel's Actual Condition and Claimant's Cooperation**

As demonstrated above, and contrary to the NMS's unfounded and unsupported allegations of "imminent risk", no evidence shows the Vessel's cargo or onboard operations pose a hazard. In fact, and completely contrary to NMS's representations to the Court, there is no cargo onboard the Vessel.  The Vessel's Master and Chief Engineer have implemented standard procedures for cargo containment, with temperature and pressure logged, properly supervised, and readily available on request. In short, Claimant has proposed reasonable compromises, including weekly summaries of the tank conditions, temperature/pressure logs, and any other data specifically tied to the safe carriage of the cargo.

More importantly, NMS's own Motion relies heavily on a supposed threat stemming from VCM's highly flammable nature. Yet, as established by Claimant's evidence (and by repeated statements from the Master and Vessel's managers), **no such cargo is currently onboard**. Where no liquid cargo remains to be maintained at special temperatures, the entire premise for "emergency removal" falls apart.

**D.   The Motion to Remove and Replace the Master**

On February 19, 2025, NMS filed this Motion, alleging that the Master's refusal to turn over sweeping categories of information "obstructs" NMS's duties. NMS now seeks the drastic measure of removing the Master altogether. In essence, NMS demands that a stable, qualified, and flag-compliant Master be replaced solely because he declined to produce broad commercial and financial materials, or to respond on a particular timeline to demands that significantly exceed legitimate safety oversight.

### III.
#### ARGUMENT AND AUTHORITIES

NMS's Motion should be denied because it relies on—and attempts to remedy—a purported safety threat that simply does not exist. In the admiralty context, removing and replacing a master under arrest is an extreme, almost never-before-seen measure.

**A.   Removal of a Vessel's Master is an Extraordinary Remedy and Unsupported by NMS's Authorities**

In their motion, NMS asserts that "[t]he Court has the power, in the context of Rule D actions, to order removal of crew members from a vessel." To support this assertion, NMS relies on one Fourth Circuit case and two U.S. District Court decisions from the District of Maryland. *See Korthinos v. Niarchos,* 175 F.2d 730 (4th Cir. 1949), *cert. denied* 338 U.S. 894 (1950); *United States v. USAF Coastal Crusader*, 210 F. Supp. 430 (D. Md., 1962); *United States v. USAF Twin Falls Victory*, 1962 WL 115652 (D. Md. Nov. 19, 1962). However, the cases NMS relies on are

clearly distinguishable from NMS' motion seeking to remove and replace Konstantinos Manolarakis as Master of the Vessel.

In *Korthinos v. Niarchos*, possessory libels were filed by the owners of two Greek vessel to remove crew members who had engaged in a four-hour sympathy sit down strikes in protest against the arrest of their union leaders by the Greek Government. 175 F.2d at 732. The crew members also refused to perform duties incident to the opening and closing of hatches and taking stores aboard ship unless given additional payment, and refused to sail the ship unless granted a bonus for six months' service. *Id.* The Court held that the court of admiralty had the power "to direct that persons engaging in a sit down strike on a vessel be removed therefrom by the Marshal of the District, to the end that the owners may have the lawful possession and use of their property." *Id*. The Court's power to remove crew members of a vessel was limited to cases where seamen had not only refused to perform their duties because of a disagreement over interpretation of the employment contract, but also engaged in a strike as a protect against government action. *Id*. NMS's motion falls clearly outside the scope of nonbinding Fourth Circuit precedent.

In *United States v. USAF Coastal Crusader*, the United States filed a possessory libel to remove crew members from an Air Force vessel where crew members had refused to accept wages and discharge and leave the vessel. 210 F. Supp. at 430. The U.S. Airforce, as the owner and operator of the Air Force vessel, had contracted with Pan-American World Airways, Inc. ("Pan Am") to furnish certain services. *Id*. Pan Am, in turn, subcontracted the operation of the vessel To Suwannee Steamship Company which employed the crew members. *Id*. at 431. When the voyage ended, the crew members refused to accept their discharge and wages and leave the vessel. *Id*. at 432. The District Court held that "[u]nder the circumstances shown by the evidence," the Government is entitled to remove the crew members from the vessel. *Id.* at 433 (citing *Korthinos*

*v. Niarchos*). The circumstances under which NMS's motion arise are distinguishable from *United States v. USAF Coastal Crusader* where the United States was entitled to possession of their vessel after crew members refused to accept their discharge and wages and leave the vessel once their voyage had ended.

Similarly, the District Court in *United States v. USAF Twin Falls Victory* held that the United States Marshal could remove crew members who had "refused to quit a [United States Air Force] public vessel, or to deliver and restore use and possession" to the United States. 1962 WL 115652 at *1 (relying on reasoning from *United States v. USAF Coastal Crusader*).

**B.     The Master's Actions Have Not Threatened Vessel Safety or Violated Court Orders**

**1.     The Vessel's Condition Is Safe and Well-Maintained**

By all indications, the Vessel is being operated in accordance with recognized safety protocols. The Master is not accused of mishandling the cargo, ignoring standard refrigeration or containment, or otherwise jeopardizing the Vessel's integrity. Moreover, and further undermining NMS's baseless representations of unsafe conditions, it should be emphasized that the Vessel recently passed an inspection by the United States Coast Guard ("USCG"), (widely and globally recognized for its stringent inspection standards), relating to the Vessel's Certificate of Compliance ("COC"). *See* **Exhibit 7** (COC). Specifically, the Vessel underwent a comprehensive COC inspection by the USCG *two weeks ago*. The comprehensive and thorough inspection involved two USCG officers for about four hours that inspected the ship's documentation, bridge navigation & communication systems, firefighting and life-saving systems, cargo handling systems, deck areas & mooring systems, along with engine rooms spaces and engine room machinery equipment. Additionally, a full inspection of accommodation areas, galley & catering equipment, provision stores, crew cabins & recreational areas was conducted. Finally, the Vessel's

officers & crew responded effectively to all drills which were requested by the attending USCG officers proving their good level of training and readiness to respond in an emergency situation. One minor deficiency was rectified immediately. Neither the Vessel's flag administration nor classification society were involved and the USCG did not require any follow-up or reinspection.

In short, this independent governmental verification by the USCG completely undermines NMS's narrative of grave safety concerns. Instead, it demonstrates that any perceived danger is simply unfounded and that the vessel remains in a safe and proper condition.

2. **Document Objections Are Legitimate, Not Obstructionist**

NMS alleges that failure to turn over every requested item equates to noncompliance or risk. However, Claimant has provided (or agreed to provide) precisely the type of information (e.g., weekly summaries of the tank conditions, temperature/pressure logs, and any other data specifically tied to the safe carriage of the cargo) that NMS reasonably might need for its limited role as substitute custdian. The Master and Claimant are merely opposed to irrelevant or excessive demands—such as requests for prior bills of lading, historical compressor logs from past voyages, or insurance or payroll data—that do not meaningfully relate to any concocted safety concerns.

Moreover, and as stated above in this Response, NMS has inexplicably rejected Claimant's previous attempts to reach an agreement to share commercially-sensitive information pursuant to a reasonable confidentiality agreement. only further raises concerns regarding NMS's true motives via its thinly-veiled discovery requests and its extraordinary and singular request to have the Vessel's Master replaced rather than pursue any other relief from the Court that would more promptly result in the distribution of this allegedly critical, safety-related information. For instance, it is quite curious that NMS did not request that the Court order the Vessel's immediate production of these allegedly critical safety-related requested items. Instead, NMS seeks to engage

in a multi-day process of replacing the command of the Vessel. As control of the Vessel is the core basis of Plaintiffs' claims in this suit, NMS's true motives certainly come into question.

### 3. No Authority Requires Disclosure of Irrelevant or Highly Proprietary Details

Courts routinely protect parties from "fishing expeditions" into commercially sensitive or legally privileged documents when safety is not genuinely at issue. Indeed, Federal Rule of Civil Procedure 26(c) permits protective orders when discovery demands are overbroad or seek irrelevant information. Confoundingly, NMS has refused Claimant's offers to share additional commercially-sensitive information under the protection of a reasonably confidentiality agreement. Here, NMS has conflated its limited safekeeping role with a perceived right to every piece of commercial and operational documentation related to the Vessel's operations over the past months, along with no restrictions as to with whom NMS can reasonably share such commercially-sensitive information.

### C. NMS Has Not Demonstrated "Emergency" or Risk of Departure

NMS grossly speculates that the Master might "unilaterally direct the Vessel to depart." This rampant inflammatory speculation—bordering on fantasy (and completely ignoring the fact that the Master has fully complied with the Vessel's territorial restrictions since the Vessel was first arrested two weeks ago)—lacks any supporting evidence other than Mr. Swimmer's contention and alleged concern over the "adverse tone associated with [his] interaction with Captain Manolarakis and other individuals purporting to act on behalf of an Eletson entity." *See* Doc. 39-1 at ¶ 20. Rather, Claimant has continued to engage in communications with NMS and have responded to demands related to genuine safety. This good-faith engagement stands at odds with any inference that the Master intends to flee jurisdiction or sabotage the Vessel's cargo systems. Moreover, as demonstrated by the attached port call list available on MarineTraffic—a

website NMS almost certainly has access to—the Vessel has been consistently trading between Texas and Mexico since November 2024. *See* **Exhibit 8** (Port Call List). As such, any contention that the Master will weigh anchor and sail away is wholly unsupported by the facts.

**D.     Granting the Motion Would Undermine Orderly Admiralty Practice**

If the Court were to grant the Motion, it would set a troubling precedent, allowing a substitute custodian to effectively force out a duly credentialed master whenever there is a dispute over discovery scope or commercial records. The Court-appointed custodian has a duty to ensure safe custody—not to assume operational command as NMS is attempting to do. A vessel's master holds specific statutory duties, particularly under the vessel's flag state regulations and the International Convention on Standards of Training, Certification, and Watchkeeping for Seafarers (STCW). Replacing him or reducing the crew precipitously could compromise the Vessel's management structure—inherently creating a safety concern.

## IV.
## <u>Cross-Motion to Disqualify National Maritime Services as Substitute Custodian</u>

NMS was appointed by this Court to serve as a substitute custodian solely to ensure the safekeeping and security of the Vessel.  Instead of limiting its actions to those tasks required for preserving the Vessel while under arrest, NMS has leveraged its position to demand extensive commercial, corporate, operational and ownership-related information—information that goes far beyond confirming the Vessel's operational safety.

In a Rule D action, the primary issue is an ownership or a possessory dispute. Yet, the custodian's role remains administrative and inherently neutral: to stand in for the U.S. Marshal, secure the Vessel, and avert any immediate safety or security hazard. It is not to conduct discovery on behalf of the Plaintiffs on the underlying merits or to pry into proprietary corporate or ownership records that do not bear on the Vessel's daily safety or security. Because these demands clearly

align with Plaintiffs' interests in uncovering operational and proprietary details, it is clear that NMS has conflated or even colluded with Plaintiffs' efforts to gather evidence for the underlying Rule D claim, going well beyond the neutral caretaker role. By using its custodial status to effectively seek (and compel) production of such information, NMS has breached its duties of neutrality and exceeded the scope of authority granted by the Court. This misconduct undermines the fairness of these proceedings and mandates that NMS be disqualified from serving in a neutral substitute custodian capacity.

Shortly after its appointment, NMS—ostensibly to ensure "safety"—began issuing demands to the Vessel's Master and Defendants, seeking a wide range of documents. Many requests pertained not to immediate vessel conditions or operational concerns, but rather to ownership interests, financial records, commercial contracts, operational details, and internal corporate details. One glaring example (among many in the NMS's follow-up request), is the request for copies of the employment contracts of the crew.

By using the threat of *ex parte* motions, unnecessary document demands, and demands for the Master's removal (and refusing previous offers to share additional commercially-sensitive information via a reasonable confidentiality agreement), NMS has attempted to coerce Claimant into turning over irrelevant and proprietary corporate information. Claimant has been forced to divert resources from litigating the core merits of the case to defending the Master against potential displacement.

Lastly, by requesting the removal and replacement of the Master rather than a more traditional path of seeking the Court's assistance with the allegedly important document/information requests also raises the distinct possibility that the motion for replacement of the Master may be to simply install a new "puppet" Master that is acting at the behest of

Plaintiffs or those aligned with Plaintiffs, effectively putting Plaintiffs in control of the Vessel. Presumably, if Plaintiffs were sufficiently satisfied that the new Master of the Vessel would accede to their commands, they could simply short-circuit the judicial process and dismiss this suit, with the newly-installed Master departing the jurisdiction and adhering to Plaintiffs' further wishes.

With the above-described circumstances in mind, including NMS's singular-focused efforts to replace the Vessel's Master with another master of NMS's/Plaintiffs' choosing (rather than engaging in more direct efforts to obtain this allegedly critical information via a reasonable confidentiality agreement or through an Order for immediate document production from this Court), NMS's motives come into serious doubt, and NMS should be replaced with a mutually-acceptable substitute custodian that will actually.

## V.
### CONCLUSION

The requested relief—removing and replacing the Vessel's Master—lacks both factual and legal justification. Claimant has complied, and stands ready to continue complying, with all reasonable safety-related obligations. At worst, there is a good-faith disagreement about the scope of document requests. That disagreement does not justify the extraordinary measure of displacing the Master. Moreover, the actions of NMS have demonstrated that it has breached its duty of neutrality, and should be disqualified from serving as a substitute custodian.

**WHEREFORE**, Defendants respectfully request that the Court:

1. Deny NMS's Motion to Remove and Replace the Master;

2. Grant Claimant's Cross-Motion to Disqualify NMS as Substitute Custodian; and

3. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

By: */s/ Dimitri P. Georgantas*
    Dimitri P. Georgantas
    State Bar No. 07805100
    Federal I.D. No. 2805
    dimitri.georgantas@roystonlaw.com
    Kevin P. Walters
    State Bar No. 20818000
    Federal I.D. No. 5649
    kevin.walters@roystonlaw.com
    Eugene W. Barr
    State Bar No. 24059425
    Federal I.D. No. 1144784
    eugene.barr@roystonlaw.com
    Blake E. Bachtel
    State Bar No. 24116055
    Federal I.D. No. 3479533
    blake.bachtel@roystonlaw.com
    ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
    1415 Louisiana Street, Suite 4200
    Houston, Texas 77002
    Telephone:  (713) 224-8380
    Facsimile:  (713) 225-9945

    **ATTORNEYS FOR CLAIMANT KITHNOS SPECIAL MARITIME ENTERPRISE**

OF COUNSEL:
ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.

### CERTIFICATE OF SERVICE

     I hereby certify that on the 20th day of February 2025, I served a true and correct copy of the foregoing pursuant to Rule 5 of the Federal Rules of Civil Procedure and/or via the CM/ECF Filing System and/or by depositing the same in the United States Mail, postage prepaid and properly addressed to all known counsel of record.

                                      */s/ Dimitri P. Georgantas*
                                      Dimitri P. Georgantas