UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| KITHNOS SPECIAL MARITIME ENTERPRISE, ELETSON HOLDINGS, INC, ELETSON CORPORATION, ELETSON GAS LLC, | § § § § § | CIVIL ACTION NO. 25-cv-00042 |
| Plaintiffs, | § § | ADMIRALTY RULE 9(h) |
| M/V KITHNOS (IMO 9711523), her engines, tackle, equipment, and appurtenances, *in rem*, | § § § § § | |
| and | § § | |
| FAMILY UNITY TRUST COMPANY, GLAFKOS TRUST COMPANY, LASSIA INVESTMENT COMPANY, ELAFONISSOS SHIPPING CORPORATION, KEROS SHIPPING CORPORATION, VASSILIS HADJIELEFTHERIADIS, LASKARINA KARASTAMATI, VASSILIS E. KERTSIKOFF, VASILEIOS CHATZIELEFTHERIADIS, KONSTANTINOS CHATZIELEFTHERIADIS, IOANNIS ZILAKOS, ELENI KARASTAMATI, PANAGIOTIS KONSTANTARAS, EMMANOUIL ANDREOULAKIS, ELENI VANDOROU, *in personam*, | § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

**DECLARATION OF LUKE FRANCIS ZADKOVICH**

Pursuant to 28 U.S.C. § 1746, Luke Francis Zadkovich declares as follows:

1

1. I am a partner at the firm of Floyd Zadkovich LLP at Caroline House, 55 High Holborn, London, United Kingdom.

2. I have an LL.B. from the University of Wollongong, Australia. I also have an LL.M. from King's College London, United Kingdom.

3. By way of brief background, I am a founding partner of Floyd Zadkovich LLP and related entities. I am currently admitted as an attorney in the state of New York and federal courts in the U.S, such as the U.S. District Court for Southern District of New York and the US District Court for Eastern District of New York.

4. I am also admitted to practice as a Solicitor Advocate in England & Wales, and as a solicitor in New South Wales, Australia.

5. I have practiced in the area of shipping, maritime, commercial and insurance disputes for approximately 20 years. Before Floyd Zadkovich LLP, I previously worked at Holman Fenwick Willan LLP, HWL Ebsworth and Thomas Miller.

6. I have been asked to provide this declaration on the validity and effect (as a matter of the law of England & Wales) of the notice of termination (the "**Notice of Termination**") of the bareboat charterparty dated 23 February 2022 (the "**BBC**") between OCM Maritime Gas 4 LLC ("**Oaktree**") and Kithnos Special Maritime Enterprise ("**Kithnos SME**") in relation to M/V KITHNOS (the "**Vessel**"). For the avoidance of doubt, nothing in this declaration is intended to opine on any relationship between Parties, whether under English law otherwise, that does not arise directly out of the BBC.

A. **Summary of Relevant Law**

7. This Declaration will demonstrate that the following statements are accurate as a matter of English law:

a. Oaktree has consistently failed to comply with the contractual and common law notice requirements under the BBC;

b. Oaktree is prevented from relying on any alleged Event of Default under Clause 45(a) of the BBC by virtue of the English law concept of the "prevention principle";

c. Additionally, Oaktree are estopped from relying on any of the alleged Events of Default to justify the termination of the BBC;

d. Oaktree are in breach of an implied duty of good faith governing their performance by virtue of the BBC's status as a "relational contract" under English law; and

e. In purporting to terminate the BBC where it had no right to, Oaktree have committed an independent repudiatory breach of the BBC;

f. The English law doctrine of "relief from forfeiture" applies to the BBC, and would operate to prevent Oaktree from repossessing the Vessel, were this matter before an English Court.

**B. The Relevant Law**

8. I take each of the points summarized in Part A above in turn:

***i. Failure to comply with notice requirements under the BBC***

9. Clause 57(b) of the BBC provides that:

   *"The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Charter for any communication or document to be made or delivered under or in connection with this Charter are:*

   *1. in the case of the Charterers to c/o Eletson Gas Inc., 118 Kolokotroni Street, 185 35 Piraeus, Greece (email address: finance@eletson.com) marked for the attention of Peter Kanellos*

*[…]*

*or any substitute address, email address, department, or officer as each party to this Charter may specifically notify to the other parties to this Charter by not less than five (5) Banking Days' notice."*

10. In the Notice of Termination,[1] Oaktree cites non-payment of six invoices as grounds for assertion that an Event of Default has occurred under Clause 45(a) of the BBC. These invoices are:[2]

    a. Invoice 34, dated 27 November 2024;

    b. Invoice 36, dated 28 January 2025;

    c. Invoice 37, dated 6 March 2025;

    d. Invoice 38, dated 28 March 2025;

    e. Invoice 39, dated 30 April 2025; and

    f. Invoice 40, dated 27 May 2025

(the "**Invoices**")

11. On a plain reading of Clause 57(b), an invoice sent by Owners for hire payable under the BBC is a "communication or document to be made or delivered under or in connection with this Charter" and must comply with the requirements of that Clause.

12. However, each of the Invoices is addressed to:

"*KITHNOS SPECIAL MARITIME ENTERPRISE*

***62, Iroon Polytechniou Avenue****, 185 35 Piraeus, Greece*

***c/o EMC Gas Corporation****"* (emphasis added)

---

[1] Attached hereto as Exhibit 1.
[2] Attached hereto as Exhibit 2.

13. It is evident that Oaktree has been sending the Invoices (1) to an address which is not specified in Clause 57(b) of the BBC; (2) to the incorrect "care of" recipient - "EMC Gas Corporation", instead of Eletson Gas, Inc, and (3) without marking the Invoices to the attention of Peter Kanellos.

14. For reasons set out in greater detail below at paras. 37 - 42, the sending of these Invoices to an address other than the registered address of Kithnos SME (under new ownership and management following the Chapter 11 reorganization of Eletson Holdings, Inc.) is sufficient grounds to estop or otherwise prevent Oaktree from asserting that it has properly communicated the Invoices to Kithnos SME.

15. In any event, it is a matter of settled English law that a communication or document sent under a contract that does not comply exactly with the requirements of an agreed notices clause will have no effect, even if the contractual requirements may be (i) meaningless (as where a valid notice would have included a meaningless but contractually required statement);[3] or (ii) pointless (as where valid service would have meant leaving the document at a party's old but contractually mandated address).[4]

16. There is a narrow exception to this rule, whereby the English court might find a defective notice is valid despite a minor defect which would not confuse a reasonable recipient with knowledge of the factual and contextual background against which a notice was sent (the "**Mannai Principle**").[5] However, this exception does not apply to cure non-compliance with a condition in a notices clause relating to when, where and how a notice, communication or document under the contract should be served.

---

[3] Siemens Hearing Instruments Ltd v Friends Life Ltd v [2014] EWCA Civ 382, attached hereto as Exhibit 3.
[4] Zayo Group International Ltd v Ainger and others [2017] EWHC 2542 (Comm), attached hereto as Exhibit 4.
[5] Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd [1997] AC 749 (HL), attached hereto as Exhibit 5.

5

17. In determining whether the Mannai Principle can be used to cure a defective notice, the English Court of Appeal developed a two-stage approach:[6]

    a. **Stage one**: a consideration of what the notice says on its true construction.

    b. **Stage two**: a matching up of the notice against the relevant requirements for that notice, to determine whether the notice meets the requirements.

18. The Court of Appeal in <u>Trafford v Total Fitness</u> stated that, whilst the Mannai Principle may be relevant to the first stage of the process, there is no basis for applying the Mannai Principle at the second stage, in effect, to rectify any defects or omissions in the notice to bring it in line with the relevant requirements.

19. Given that the Invoices:

    a. Have clearly been sent to an address not agreed in the BBC;

    b. Are not marked for the attention of Mr. Peter Kanellos; and

    c. Have been sent to EMC Gas Corporation (and not Eletson Gas, Inc.) as the agreed "care of" recipient,

    it is clear that the Invoices do not comply with the contractual requirements of Clause 57(b) of the BBC and the Mannai Principle (even if Owners were to rely on it) would not assist in curing any such defect.

20. Absent evidence that Kithnos SME (under its proper ownership and management) instructed Oaktree under Clause 57 to address the Invoices the way they were in fact addressed (which has not been provided or placed before this Court), the Invoices were not properly communicated to Kithnos SME under the BBC. In turn, Oaktree's failure to comply with Clause 57 means that the Invoices were not capable of triggering the relevant

---

[6] Trafford Metropolitan Borough Council v Total Fitness UK Ltd [2002] EWCA Civ 1513, attached hereto as <u>Exhibit 6</u>.

payment obligations of Kithnos SME and the associated Event of Default under Clause 45(a) of the BBC as alleged by Oaktree.

### ii. Oaktree's prevention of Kithnos SME's compliance with the BBC

21. In addition, Oaktree is further prevented from relying on an alleged Event of Default under Clause 45(a) of the BBC by virtue of the English law doctrine of the prevention principle. By failing to issue the Invoices correctly and communicating the Invoices to Kithnos SME (under the new ownership and management following the Chapter 11 reorganisation of Eletson Holdings, Inc), Oaktree prevented Kithnos SME from performing its payment obligations, which Oaktree now say were breached and caused the alleged Event of Default.

22. The prevention principle is a well-established English legal doctrine which provides that a promisee cannot insist upon the performance of an obligation which they have prevented the promisor from performing.[7] There is no term in the BBC which expressly displaces the prevention principle.

23. In a Court of Appeal judgment in *Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board* [1973] 1 W.L.R. 601 at 607, Lord Denning held that:

> "*when there is a stipulation for work to be done in a limited time, if one party by his conduct - it may be quite legitimate conduct, such as ordering extra work - renders it impossible or impracticable for the other party to do his work within the stipulated time, then the one whose conduct caused the trouble can no longer insist upon strict adherence to the time stated.*"[8]

---

[7] Multiplex Constructions (UK) Ltd v Honeywell Control Systems Ltd (No 2) [2007] EWHC 447 (TCC), attached hereto as Exhibit 7. See also Cheall v APEX [1983] 2 AC 180, attached hereto as Exhibit 8.
[8] Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board [1973] 1 W.L.R. 601 at 607, attached hereto as Exhibit 9.

24. Although the Prevention Principle originated in the context of construction contracts, it is now uniformly accepted to apply to all contracts, including charterparties and finance leases.

25. The principle also applies in the context of purported terminations of contracts. In *Cheall v APEX*, Lord Diplock went on to clarify the scope of the prevention principle in this context:

    *"...except in the unlikely case that the contract contains clear express provisions to the contrary, it is to be presumed that it was not the intention of the parties that either party should be entitled to rely upon his own breaches of his primary obligations as bringing the contract to an end, i.e. as terminating any further primary obligations on his part then remaining unperformed."*

26. In the present circumstances, the "work" which Kithnos SME was obligated to do under the BBC was to pay the hire Invoices. The "stipulated time" is the due dates on which the hire Invoices fell due.

27. Clauses 34(a), (g) and (h) of the BBC presuppose that hire payable to Oaktree under the Invoices includes variable hire. Those clauses also presuppose that hire payable to Oaktree may include increased monthly hire where Oaktree may unilaterally choose to increase it. In addition, Clause 34(k) of the BBC contemplates that Oaktree would be issuing certificates or determinations of rate or amounts payable, which certificates or determinations "shall specify in reasonable detail the basis of computation of the relevant rate or amount". It is clear therefore that the BBC contemplated issuance of invoices by Oaktree to Kithnos SME, and not independent payment by Kithnos SME without any

8

supporting documents or calculations of hire (including variable or increased hire) from Oaktree.

28. Here, I understand Oaktree was aware of the change in ownership and management of Kithnos SME following the Chapter 11 reorganisation proceedings in relation to Eletson Holdings, Inc. (the "**Chapter 11 Proceedings**").

29. I understand that the Oaktree group participated in the Chapter 11 Proceedings as creditors, through multiple Oaktree entities which are registered owners of other Eletson group vessels. These entities are OCM Maritime Autumn LLC, OCM Maritime Rhine LLC, OCM Maritime Thames LLC, and OCM Maritime Yukon LLC – see the list of creditors in the bankruptcy proceedings attached hereto as Exhibit 10. I do not recite the details of the Chapter 11 Proceedings here, as I understand the relevant issues have been well ventilated before this Court in previous briefings in these proceedings.

30. I further understand that these Oaktree entities voted on the Chapter 11 plan of reorganisation which vested ownership and control of Eletson Holdings, Inc. and its assets (including its directly and indirectly owned subsidiaries such as Kithnos SME) into the new shareholders and management – see page 11 of the Tabulation of Votes on the Competing Chapter 11 Plans of Reorganization For Eletson Holdings Inc. and Its Affiliated Debtors] attached hereto as Exhibit 11.

31. I also understand that Oaktree and its counsel were aware of the present action since at least February 7, 2025 and participated in the present action since at least February 19, 2025, including by:

    a. filing a statement of interest in the Vessel signed by or on behalf of multiple Oaktree entities and individuals (Dkt. 38);

    b. filing several certificates / disclosures of interested parties (Dkts. 49 and 50);

    c. filing several answers to the plaintiffs' complaint which itself set out at length the transfer of ownership of Kithnos SME from old Eletson management to the new (Dkts. 52 and 62);

    d. filing a response to plaintiffs' motion to release the Vessel under Supplemental Rule E(5), which Oaktree did not object to (Dkt. 79);

    e. filing a proposed condition for the release of the Vessel, which expressly mentioned "issuance of invoices to the party or entity responsible for making timely payments to [Oaktree] pursuant to the Bareboat Charter Party" (Dkts. 91 and 91-1);

    f. participating in no less than four hearings / status conferences in the present action and multiple calls and "meet and confer" conferences, including those where payment of hire under the BBC and change of ownership and control of Kithnos SME were being discussed.

32. Further still, I understand that as early as January 8, 2025, Oaktree and its counsel (including Milbank LLP) were aware that email addresses in the domain @eletson.com were being controlled (wrongfully) by the old shareholders and managers of the Eletson group of companies. A true and correct copy of the relevant correspondence dated January 8, 2025 involving Mr. Matt Brod of Milbank LLP is attached hereto as <u>Exhibit 12</u>. See also Dkts. 92-5 and 2-21.

33. I understand that both through the participation of Oaktree entities in the Chapter 11 Proceedings and through Oaktree's direct participation in the present action, Oaktree has been on notice (whether actual or constructive) of the change in ownership and control of Kithnos SME. However, Oaktree continued to send Invoices (and ultimately the Notice of

Termination) to physical and electronic addresses which are either not specified in the BBC, or are associated with the previous ownership and management of Kithnos SME. Oaktree took this action despite knowledge that following the Chapter 11 Proceedings, neither the address and email address set out in Clause 57(b) of the BBC, or the address to which it had actually been sending the Invoices, would cause the Invoices to be received by Kithnos SME (under new ownership and management following the Chapter 11 Proceedings). Further, Oaktree took this action despite knowledge of the contact details of Kithnos SME under this new ownership and management and the details of its legal counsel,

34. Further, prior to serving the Notice of Termination, Oaktree made no effort to bring either the Invoices, or the fact that they remained unpaid, to the attention of Kithnos SME under the new ownership and management.

35. Given that the monthly amounts payable under the BBC were not fixed, and that the BBC contemplates a scenario in which Oaktree would need to certify the amounts due under the BBC in order for them to become binding (see above at para. 27), in not providing either certification of the amounts due or the Invoices (which contained the bank details under which payment was to be made, which were not contained in the BBC), Oaktree made it impossible for the Kithnos SME (under the new ownership and management) to make the payments, the absence of which Oaktree argue constitutes the Event of Default. This is precisely a scenario where the prevention principle applies, as per Lord Denning's comments in *Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board* [1973] 1 W.L.R. 601 at 607 – see above at para. 23.

36. In failing to provide the Invoices to Kithnos SME under the new ownership and management, Oaktree prevented Kithnos SME from paying these Invoices. Following the approach in *Cheall v APEX* [1983] 2 AC 180 (see above at para. 25), English law is clear that termination is not available to Oaktree in these circumstances.

### iii. Estoppel

37. I do not recite here the procedural history of this action, save as to say that the conduct of Oaktree in this action (including steps taken by Oaktree as set out at para. 31 above) are not consistent with Oaktree's present reliance on the alleged Events of Default as grounds for termination of the BBC.

38. I understand that, to date, Oaktree has engaged, seemingly on good faith terms, to agree the release plan for the Vessel – see Dkts. 79, 91, 91-1. During this time, Oaktree has engaged with Kithnos SME (under the new ownership and management), whilst not informing it of any of the alleged Events of Default, sending the Invoices and any notices of default (to the extent any were sent) to electronic and physical addresses which it knew, or ought to have known, were not under the control of Kithnos SME under such new ownership and management.

39. As a matter of English law, this conduct gives rise to an estoppel by representation, whereby Oaktree is prevented from relying on the alleged Events of Default as justification for terminating the BBC or otherwise. In order to establish estoppel by representation, a party must generally establish the following factors:

    a. A representation was made by a party to litigation (B), or some person for whose representations that party is responsible.[9]

    b. That representation contradicts a representation or case which B subsequently seeks to advance in litigation.[10]

    c. The original representation was made with the intention of inducing the representee (A) to rely upon it.

    d. A changed its position in reliance upon the representation and would suffer detriment if B were permitted to resile from the representation in the proceedings.[11]

40. English law also recognises the concept of estoppel by silence or acquiescence. The factors in establishing such an estoppel are the same as an estoppel by representation, but in circumstances where the "representation" is one party's silence. According to Bingham J in *The Lutetian* [1982] 2 Lloyd's Rep 140,[12] the duty necessary to found an estoppel by silence or acquiescence arises where a reasonable man would expect a person acting honestly and responsibly to bring the true facts to the attention of another party known by him to be under a mistake as to their respective rights and obligations.

41. Recently, in *Starbev GP Ltd v Interbrew Central European Holdings BV* [2014] EWHC 1311 (Comm)[13], Blair J held that a duty to speak may arise where one party is proceeding

---

[9] Ted Baker Plc v Axa Insurance UK Plc [2017] EWCA Civ 4097 (11 August 2017), attached hereto as <u>Exhibit 13</u>, an estoppel may also arise where a party has remained silent in the face of a duty to speak. In particular if, in the light of circumstances known to the parties, a reasonable person in the position of the person seeking to rely upon the estoppel would expect the other party, acting honestly and reasonably, to take steps to make his position plain.

[10] The representation can be communicated by an agent (in this case, Oaktree's counsel through their engagement in negotiations) such as to give rise to an estoppel against their principal (De Tchihatchef v Salerni Coupling Ltd [1932] 1 Ch 330 at 342, attached hereto as <u>Exhibit 14</u>).

[11] Detrimental reliance can be comprised by the failure to take action or continuing action that A would otherwise have ceased (Knights v Wiffen (1870) LR 5 QB 660, attached hereto as <u>Exhibit 15</u>).

[12] Attached hereto as <u>Exhibit 16</u>.

[13] Attached hereto as <u>Exhibit 17</u>.

13

on the assumption that something is agreed, whereas the other party knows that it is in dispute. The judge accepted that, absent a relationship of good faith or partnership or something akin to a joint enterprise, the court would not impose a duty to speak in the absence of some kind of impropriety. However, that impropriety might come from the act of staying silent itself, as in the circumstances set out in *The Lutetian*.

42. Given the above, the factors of an estoppel by silence or acquiescence are all made out on the present facts. As to this:

    a. Oaktree represented to the Kithnos SME:

        i. by its conduct in sending the Invoices (and any notices of default) to addresses which it knew that the Kithnos SME under new ownership had no access to; and

        ii. simultaneously, in the course of the present action, by not notifying the Kithnos SME under such new ownership that there were alleged persisting Events of Default,

    that there were no Events of Default ongoing which Kithnos SME needed to remedy;[14]

    b. This conduct contradicts the position which Oaktree now advances in the Notice of Termination that the Invoices were properly communicated to Kithnos SME under the new ownership;

---

[14] Whether or not a relevant representation was made, and the meaning of that representation, is interpreted by reference to the reasonable listener. A claim of estoppel will only succeed if, on the basis of that interpretation, the representation is precise and unambiguous, or clear and unequivocal, in its meaning (Low v Bouverie [1891] 3 Ch 82, attached hereto as <u>Exhibit 18</u>). In these circumstances, a reasonable listener would interpret Oaktree's engagement in negotiations regarding the release of the vessel and the concurrent silence as to the existence of the alleged Events of Default as a clear and unequivocal representation that there were no Events of Default persisting that required curing by the reorganized Kithnos SME.

14

  c. There appears to be no other rational explanation of Oaktree's conduct, other than to set up a scenario in which, it says, it is entitled to terminate the BBC for default; and

  d. Kithnos SME under the new ownership would have taken steps to cure the alleged Events of Default (including but not limited to paying the sums claimed under the Invoices), had it been properly put on notice that such alleged Events of Default existed and were persisting.

### *iv. Oaktree is in breach of its implied duty of good faith*

43. Even if termination rights have arisen under the BBC, Oaktree have breached the implied duty of good faith under the BBC, which arises as a result of the BBC being a "relational contract". As a matter of English law, a contract is considered a "relational contract" if it falls under the following non-exclusive list:[15]

  a. A long-term contract or a contract the parties intend to be long-term, even though it lacks a fixed term and allows termination by notice;

  b. The parties intend their roles to be performed with integrity and with fidelity to their bargain;

  c. The parties are committed to collaborating with one another;

  d. The spirits and objectives of the venture cannot be expressed exhaustively in a written contract;

  e. The parties each repose trust and confidence in one another;

---

[15] Bates v Post Office [2019] EWHC 606 (QB), attached hereto as <u>Exhibit 19</u>.

    f. The contract involves a high degree of communication, co-operation and predictable performance based on mutual trust and confidence, and expectations of loyalty;

    g. One or both parties have made a significant investment;

    h. The relationship is exclusive.

44. A long-term finance bareboat charter of the type here falls squarely within the definition of a "relational contract", as envisaged in <u>Bates v Post Office</u>. As such, English law implies a duty of good faith into the BBC.

45. Where an implied duty of good faith arises in a relational contract, it requires the parties to avoid conduct that reasonable and honest people would regard as "commercially unacceptable" and not to act to undermine the bargain entered or the substance of the contractual benefit bargained for.

46. In the present circumstances, Oaktree has breached its duty to act in good faith under the BBC:[16]

    a. The answer to the essential question, being whether the "relevant power has been abused"[17] by Oaktree is that it patently was. The discretion was neither exercised honestly nor in good faith, but rather arbitrarily, capriciously or unreasonably.

    b. The decision to terminate the BBC was based on an improper purpose and/or a failure by Oaktree to direct themselves to the necessary relevant factor when they were exercising their discretion, in that:

---

[16] Yam Seng Pte Ltd v International Trade Corp Ltd [2013] EWHC 111 (QB), attached hereto as <u>Exhibit 20</u>.

[17] *Abu Dhabi National Tanker Co v Product Star Shipping Ltd (The "Product Star") (No 2)* [1993] 1 Lloyd's Rep 397, 404, attached hereto as <u>Exhibit 21</u>.

     i. Oaktree intentionally or recklessly and without good reason, failed or refused to communicate with Kithnos SME (under the new ownership and management) in order to remedy or rectify any alleged Events of Default before any terminations could be lawfully exercised, and/or

     ii. Oaktree capriciously, recklessly or unreasonably failed to notify Kithnos SME under such new ownership of the Invoices, in full knowledge that it was the correct party to address those Invoices to, in particular given Oaktree's conduct in the present action.

47. Kithnos SME under the new ownership and management relied to its detriment on the understanding that Oaktree would abide by the implied duty of good faith, which was incumbent on the parties here.

### v. *Oaktree's repudiatory breaches*

48. It is a matter of settled English law that if a party purports to terminate a contract when it was in fact not entitled to do so, such an action is in itself an anticipatory repudiatory breach of the contract.[18]

49. In these circumstances, in alleging that Kithnos SME under the new ownership and management has repudiated the BBC and in purporting to terminate the BBC, Oaktree has itself repudiated the BBC. Accordingly, Kithnos SME under the new ownership and management is entitled to avail itself of the remedies associated with such a breach, i.e. to terminate the BBC and claim damages, or to affirm the BBC and also claim damages.

---

[18] Acre 1127 Ltd v De Montfort Fine Art Ltd [2011] EWCA Civ 87, attached hereto as <u>Exhibit 22</u>.

### vi. *Relief from forfeiture*

50. An English Court would also apply the English law equitable doctrine of "relief from forfeiture" to the present case, were it to be heard before such English Court.

51. One consequence of the nature of the BBC as a lease is that the equitable doctrine of relief from forfeiture ("**Relief from Forfeiture**") may be available. The question as to the applicability of Relief from Forfeiture arose directly and was considered in The Jotunheim,[19] a case in which it was common ground that the court is in principle entitled to grant relief from forfeiture of a bareboat charterparty where the general criteria for the grant of relief from forfeiture are satisfied.

52. The authorities indicate that in order to determine whether there is jurisdiction to grant Relief from Forfeiture, the following considerations are of particular relevance:[20]

    a. (1) whether the contract involves the transfer of proprietary or possessory rights;[21]
    b. (2) if so, whether
        i. "it is possible to state that the object of the transaction and of the insertion of the right to forfeit is essentially to secure the payment of money";[22] and/or
        ii. "the primary object of the bargain is to secure a stated result which can effectively be attained when the matter comes before the Court, and

---

[19] More OG Romsdal Fylkesbatar AS v The demise charterers of the ship Jotunheim [2005] 1 Lloyd's Rep. 181, attached hereto as Exhibit 22.
[20] Celestial Aviation Trading 71 Ltd v Paramount Airways Pvt Ltd [2011] 1 Lloyd's Rep. 9 at [42], attached hereto as Exhibit 23.
[21] Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana (The Scaptrade) [1983] A.C. 694 at 700 attached hereto as Exhibit 24.
[22] Shiloh Spinners Ltd v Harding [1973] A.C. 691 at 722, per Lord Wilberforce attached hereto as Exhibit 25.

    where the forfeiture provision is added by way of security for the production of that result";[23] and

  c. if so, whether reasons of legal policy support the existence of such a jurisdiction.[24]

53. These considerations support the application of the equitable doctrine of relief from forfeiture to prevent an owner withdrawing a ship under a bareboat charterparty used as part of the financial arrangements for the purchase of a ship, whether structured as a conditional sale or as a hire purchase, but not to prevent an owner withdrawing a ship under an operating bareboat charterparty,[25] at least unless it contains an option to purchase.

54. Where there is jurisdiction to grant relief from forfeiture, relevant considerations will include:

  a. charterer's conduct (or misconduct) in and in relation to the proceedings;

  b. prior performance (or non-performance) of the bareboat charter;

  c. any prejudice to the charterer if the bareboat charterparty was terminated and the ship repossessed; and

  d. and any unwarranted windfall the owner would receive as a result of terminating the bareboat charter and obtaining repossession of the ship.

55. In the present circumstances:

  a. The reorganized and properly constituted Kithnos SME has not committed any misconduct in the course of these proceedings. In fact, any misconduct which has been committed has been done so by Oaktree for the reasons set out herein.

---

[23] Shiloh Spinners Ltd v Harding [1973] A.C. 691 at 723, per Lord Wilberforce.
[24] Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana (The Scaptrade) [1983] A.C. 694 at 703.
[25] Celestial Aviation Trading 71 Ltd v Paramount Airways Pvt Ltd [2011] 1 Lloyd's Rep. 9 at [53]–[57].

    b. But for the misconduct of Oaktree, the reorganized and properly constituted Kithnos SME would have faithfully executed any and all obligations which would otherwise have arisen on it under the BBC.

    c. The reorganized and properly constituted Kithnos SME would suffer substantial prejudice if the BBC was terminated and the Vessel repossessed. It would lose the benefit of both the Purchase Option under the BBC, and the ability to exploit the Vessel for commercial purposes.

    d. In circumstances where the BBC is terminated, Oaktree may attempt to commercially exploit the Vessel for an indefinite period, which would lead to Oaktree gaining access to Vessel revenues above and in addition to the sums it may realize in selling the Vessel to a third party.

56. In these circumstances, Relief from Forfeiture clearly applies.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 25 June 2025, in London, United Kingdom.

_____
    Luke F. Zadkovich